UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| COOL SPRINGS FINANCIAL GROUP, LLC, and JESSE A. LEE, ) ) ) Plaintiffs, ) ) v. ) ) ANDREW S. ALBRIGHT and ) ALLIANCE LIFE USA, INC. d/b/a ) NATIONAL AGENTS ALLIANCE, ) ) Defendants. ) ) | Case No. 3:19-cv-0964 Judge Aleta A. Trauger |

## MEMORANDUM

Andrew S. Albright and Alliance Life USA, Inc. ("Alliance") have filed a Motion to Dismiss (Docket No. 29), to which Cool Springs Financial Group, LLC ("CSFG") and Jesse A. Lee have filed a Response (Docket No. 33), and Albright and Alliance have filed a Reply (Docket No. 35). For the reasons set out herein, the motion will be denied.

## I. BACKGROUND[1]

CSFG is a company based in Williamson County, Tennessee that sells life insurance-based financial products. (Docket No. 25 ¶¶ 2, 15.) Lee, at all times relevant to this case, was an Executive Vice President of CSFG. (*Id.* ¶ 4.) CSFG has developed a market niche for itself offering "structured premium-financed life insurance strategies"—in other words, life insurance policies for which the premiums are paid with borrowed money. (*Id.* ¶ 15.) CSFG claims that the products it sells—that is, life insurance policies bundled with loans—allow its clients to obtain life insurance

---

[1] Unless otherwise indicated, these facts come from the First Amended Complaint and are treated as true for the purposes of the Motion to Dismiss.

"with minimal cash outlay or even no cash outlay and with minimal risk." (*Id.*) CSFG makes this possible "by procuring life insurance policies which have terms that coordinate with advantageous financing procured from banks at rates and upon terms that coordinate with the terms of the policies." (*Id.*) CSFG's "unique and proprietary methods provide structured premium-financed solutions not seen in the general [marketplace]." (*Id.* ¶ 16.)

In order for CSFG to design its products, it spends a substantial amount of money on third-party actuaries that examine potential life insurance policies to see if they would be suited for a product in the CSFG model. The results of the studies that CSFG commissions from the actuaries are sent to CSFG's owner and Chief Executive Officer, Sam Watson, and are not shared with anyone else, either within CSFG or outside the company. (*Id.* ¶¶ 3, 18–19.)

CSFG claims to tailor its products specifically to clients in a number of ways. According to CSFG, it "first determines the specific objectives, needs and other relevant circumstances" of the client, examines the various potential policies, and then "determines how the components of that policy should be structured to provide the optimum results for that client." (*Id.* ¶¶ 20–23.) CSFG has listed a number of components that it must determine in order to tailor a product to a client. (*Id.* ¶¶ 23–24.) Considering all of those components, CSFG creates what it refers to as a client-specific "blueprint" for its product. (*Id.* ¶ 25.) These blueprints rely on both the actuarial studies that CSFG has purchased and "the extensive experience, expertise and knowledge which [CSFG's] principals have acquired over the course of approximately 20 years." (*Id.* ¶ 26.) Once the product is designed, CSFG coordinates between the insurer, the lending institution, and the client to complete the product. (*Id.* ¶ 27.)

One of the ways that CSFG markets its products is as a tool for retaining high-value employees. At some point in or prior to March of 2017, CSFG decided that it would try to sell a

2

CSFG debt-financed policy to North Carolina State University ("NC State") as part of its compensation to its head football coach, David William Doeren. (*Id.* ¶¶ 29–32.) Alliance is a North Carolina-based insurance marketing company owned by Albright, whom Lee knew to have contacts and relationships that might allow CSFG to have access to Doeren. (*Id.* ¶¶ 6–7, 9.) On May 17, 2017, Lee sent Albright a text message reading: "I need a intro/partner for NC State. You have a ton of credibility with them. I would like to show you what I have to offer. If you like it… we partner up. If not no big deal. Will you sign an NDA?" Albright responded, "Yup Yup Im in." (*Id.* ¶ 33.)

The "NDA" to which Lee was referring was CSFG's standard nondisclosure agreement that it required a person to sign before CSFG would reveal its methods and the details of its financed life insurance products. (*Id.* ¶ 34.) Albright signed the NDA on June 7, 2018, and Lee signed it for CSFG the next day. (*Id.* ¶ 35.) The NDA included the following provisions:

> 1. <u>Confidential Information.</u> All trade secrets, operational and strategic information, information technology, financial data, business plans, customer information, structural information, and market information heretofore or hereafter disclosed by Company to Disclosee, whether orally, electronically or in writing, shall be deemed to be confidential information of Company ("Confidential Information"). . . .
>
> 4. <u>Retention of Confidential Information.</u> Disclosee shall retain all Confidential Information in confidence, exercising the same standard of care used by Disclosee to protect its own confidential and proprietary information, to prevent the disclosure of Confidential Information to any third party. Disclosee shall not use Confidential Information for any purpose other than in furtherance of the purposes described in the introductory paragraph of this Agreement; i.e., in furtherance of its business relationship with Company. . . .
>
> 5. <u>Permitted Use of Confidential Information.</u> Confidential Information disclosed hereunder is made available to Disclosee solely for the purposes of evaluation, examination, research, testing and/or otherwise furthering the business relationship contemplated by the parties. Disclosee agrees that it will not make, use, sell, incorporate, exploit, for its own or any other purpose or in any manner other than as authorized by this Agreement or as otherwise required in connection with the

3

parties' business relationship, any portion of the Confidential Information or other information that is or may be disclosed by Company.

(*Id.* ¶ 38.) The NDA provided that it would "be governed and construed in accordance the laws of the State of Tennessee." (*Id.* ¶ 39.)

According to CSFG, Albright had previously had no meaningful knowledge or understanding of debt-financed life insurance. (*Id.* ¶ 40.) After Albright had signed the NDA, however, Lee explained the concept to him and laid out CSFG's methods, including how it marketed the plans as a way to retain employees without significant immediate cash outlay. Lee told Albright about how the University of Michigan had used a CSFG product as a "means of retaining its head football coach, Jim Harbaugh." Lee proposed working with NC State to set up a similar deal for Doeren. Albright agreed to participate. (*Id.* ¶ 41–42.) On the same day, Lee met with Alliance chief financial officer Keith Hall, to whom he explained all of the same information. (*Id.* ¶ 43.)

CSFG claims that "[t]he use of structured premium-financed life insurance solutions as a device for retention of an employee was a relatively new development in the use of premium-financed life insurance" and that "[t]he use of structured premium-financed solutions to retain numerous employees as a group was an even more recent development." (*Id.* ¶ 45.) CSFG does not claim that there is anything novel or even unusual about offering life insurance as part of an employee's benefits. Nor does CSFG dispute that one purpose of employee benefits, generally speaking, is employee retention. CSFG's claim, rather, is that CSFG was among the only companies offering this particular type of debt-financed life insurance policy arrangement specifically as an employee benefit, particularly for high-value employees. In that regard, CSFG states that it was a "leader" in the field with "very few competitors," in large part because making the details of such arrangements work is complex and difficult without CSFG's know-how . (*Id.*)

4

In addition to the plan to target Doeren, Lee spoke to Albright about how Albright could use debt-financed life insurance products to help retain Alliance's own key employees. (*Id.* ¶ 46.) Lee suggested that the commission that Albright would receive from the sale of those policies would more than offset the cash outlay Alliance would have to make to fund them. Therefore—according to the pitch—Albright would be able to offer his employees a new benefit that would help him retain them, while actually making a profit on the transaction. (*Id.*) According to CSFG, "Albright enthusiastically expressed his approval of " CSFG's products, "not only for potential clients such as Coach Doeren, but also as a means for Albright to retain his key employees." (*Id.* ¶ 47.)

CSFG claims that, at this point, Albright, both individually and on behalf of Alliance, entered into an agreement to "work with CSFG and Lee to offer, sell and implement the structured premium financed solutions which CSFG would formulate and implement." (*Id.* ¶ 48.) The agreement alleged appears to have been originally oral, although there are contemporaneous emails and text messages that arguably memorialize some of its terms. According to CSFG, the agreement encompassed both the Doeren proposal and the proposal regarding Alliance employees, as well as the possibility of additional potential clients. (*Id.* ¶ 49.) CSFG describes the division of labor under the agreement as: "Lee and Albright/Alliance [were] to market the product. CSFG was to make the product." (*Id.* ¶ 50.) CSFG, Lee, Albright, and Alliance also agreed to a breakdown of commissions for the sales, with CSFG retaining 20% and the rest being divided equally between Lee and Albright/Alliance. (*Id.* ¶ 51.)

On June 9, 2017, Albright sent Lee text messages asking Lee to obtain quotes for CSFG products for six of Alliance's key employees, whom Albright named. The two continued to exchange text messages and discussed Albright's approaching NC State and Doeren to pitch the

5

possibility of offering a financed life insurance product to Doeren. Lee stressed that they should get Alliance's products "rolling," so that Albright could approach the school as a client of CSFG, not merely a marketer, which Lee believed would lend Albright more credibility. (*Id.* ¶¶ 55–57.)

On June 12, 2017, Albright met with Doeren. After the meeting, Albright texted an update to Lee. He explained that the meeting had gone well, but that NC State had been resistant to offering comparable benefits in the past. Albright suggested that "[w]e need to get in with [Doeren's] agent up in New York" to continue to pursue the deal. (*Id.* ¶ 58.)

In June and August of 2017, Lee obtained information from Albright and 29 of Alliance's key employees, for the purpose of providing CSFG products to them. Lee's work included obtaining completed information forms from the employees, arranging for medical examinations of Albright, Albright's wife, and 23 of the employees, preparing numerous spreadsheets that were sent to Albright for review, and collecting financial documents from the employees. (*Id.* ¶ 59.) CSFG has provided examples of the spreadsheets it prepared and sent. (Docket Nos. 25-2 & -3.) They appear to contain detailed information about loans and policy benefits for CSFG products. (*Id.*) During those two months, Lee worked six to eight hours per day for five or six days per week on implementing CSFG's model with regard to Albright, Albright's wife, and the Alliance employees. (Docket No. 25 ¶ 61.) Lee and Albright remained in frequent communication throughout the process. CSFG has provided sample text messages from the period that appear to show progress toward making the proposed sales. (*Id.* ¶¶ 62–68.) Beginning in late August 2017, however, Albright became less responsive. (*Id.* ¶ 69.)

CSFG alleges that, at some point, Albright decided to simply cut CSFG out of the process and "implement the same structured financing solutions by dealing directly with the insurance carriers and financial institutions, rather than through CSFG and Lee." (*Id.* ¶ 70.) On September

6

12, 2017, Albright sent Lee a text message purporting to explain Albright's loss of interest in the debt-financed policies: "Jesse, all of my wealthy advisors are recommending that I not leverage anything. No loans or minimum loans and no leveraging life insurance . . . . they all suggest I keep hammering my own business and growing." (*Id.* ¶ 71.) In reality, CSFG alleges, Albright was attempting to conceal his decision to go forward with the same strategy without CSFG or Lee. (*Id.*)

CSFG and Lee remained unaware of Albright's actions until July of 2019, when *InsuranceNewsNet* magazine published an article about Albright that, among other things, revealed that Albright had implemented financed insurance policies for 71 of Alliance's employees, starting in January of 2019. CSFG claims, on information and belief, that Albright and Alliance used the blueprints that CSFG formulated and provided to Alliance in order to provide "the same" products to Alliance's employees without paying CSFG any commission. (*Id.* ¶ 78.) CSFG claims that, "[w]ithout the 'blueprints' and the knowledge which Lee had imparted to Albright, Albright and Alliance would not have known how to" assemble and implement the complex and specialized financial products at issue. (*Id.*)

On September 24, 2019, CSFG and Lee sued Albright and Alliance in Williamson County Chancery Court. (Docket No. 1-1 at 1.) On October 29, 2019, the defendants filed a Notice of Removal based on the diversity of the parties' citizenship. (Docket No. 1.) On November 25, 2019, the defendants filed a Motion to Dismiss. (Docket No. 14.) On January 6, 2020, CSFG and Lee filed an Amended Complaint (Docket No. 25), and the court held that the pending motion was moot (Docket No. 26). The Amended Complaint pleads three counts. Count I is for breach of contract and breach of the duty of good faith and fair dealing, based on the alleged contract to market the debt-financed policy arrangements jointly. (*Id.* ¶¶ 85–92.) Count II is for breach of the

7

NDA. (*Id.* ¶¶ 93–100.) Count III is for breach of fiduciary duty arising out of the parties' alleged joint venture. (*Id.* ¶¶ 101–08.)

On January 21, 2020, Albright and Alliance filed a Motion to Dismiss. (Docket No. 29.) They argue that the plaintiffs have failed to plead the existence of an enforceable marketing contract or any joint venture. Although the defendants do not, at this stage, dispute the existence or enforceability of the NDA, they argue that the plaintiffs have failed to plead that the defendants committed any violation of their duties under that contract.

## II. LEGAL STANDARD

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the

8

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

### III. ANALYSIS

#### A. Breach of Marketing Contract

The defendants argue that the plaintiffs have failed to adequately allege facts on which a claim for breach of oral contract could be premised with regard to Alliance's decision to purchase financed life insurance products from parties other than CSFG. The defendants argue, in the alternative, that any such claim would be barred by the statute of frauds.

**1. Breach.** Albright and Alliance argue that the plaintiffs have failed to plead that Albright and Alliance violated any agreement to market CSFG products and share commissions, because the alleged agreement was too indefinite to enforce and, in any event, none of the contemplated sales actually occurred. The defendants argue that they never purchased CSFG's products and instead merely purchased financed life insurance at a later date from other vendors in unrelated transactions. CSFG and Lee dispute that the contract was indefinite and respond that they have not merely alleged that Alliance purchased some sort of financed life insurance for its key employees, but that it bought the very products that CSFG designed. Rather than a case of Alliance's choosing to buy from a competitor, the plaintiffs argue, this is a case of CSFG performing the important work of the middleman and architect of the underlying transactions, only to be cut out when the deal was actually done.

In Tennessee, a claim for breach of contract has three essential elements: (1) the existence of an enforceable contract; (2) nonperformance amounting to a breach of that contract and (3)

9

damages caused by the breach of contract.[2] *Ingram v. Cendant Mobility Fin. Corp.*, 215 S.W.3d 367, 374 (Tenn. Ct. App. 2006). If CSFG and Lee can establish the first two elements with regard to Count I, then the third element will likely follow, because the breach would mean that they were deprived of commissions to which they were entitled. The defendants, however, dispute that the Amended Complaint adequately alleges either an enforceable contract or a breach.

"Tennessee law defines a contract as '[a]n agreement between two or more parties creating obligations that are enforceable or otherwise recognizable at law.'" *Edmunds v. Delta Partners, L.L.C.*, 403 S.W.3d 812, 823 (Tenn. Ct. App. 2012) (quoting *Green v. Jones*, No. E2011–02587–COA–R3CV, 2012 WL 2737803 (Tenn. Ct. App. July 10, 2012)). "A contract 'must result from a meeting of the minds of the parties in mutual assent to the terms, must be based upon a sufficient consideration, free from fraud or undue influence, not against public policy and sufficiently definite to be enforced.'" *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001)(quoting *Higgins v. Oil, Chem., & Atomic Workers Int'l Union, Local # 3–6 77*, 811 S.W.2d 875, 879 (Tenn. 1991)). "'Broadly speaking, preliminary negotiations as to terms of an agreement do not constitute a contract, although this does not preclude the formation of a binding contract during the negotiations." *Gurley v. King*, 183 S.W.3d 30, 42 (Tenn. Ct. App. 2005) (quoting 17 Am. Jur. 2d Contracts § 25 (1964)).

"[A] contract can be expressed, implied, written, or oral," but, regardless of the form, the contract "must be sufficiently definite to be enforced." *Rice v. NN, Inc. Ball & Roller Div.*, 210 S.W.3d 536, 542 (Tenn. Ct. App. 2006) (quoting *Jamestowne on Signal, Inc. v. First Federal Sav. & Loan Ass'n*, 807 S.W.2d 559 (Tenn. Ct. App. 1990)). "If the essential terms of an alleged

---

[2] Both the plaintiffs and the defendants analyze this case, including the claims not directly premised on the NDA (which has a choice of law provision), pursuant to Tennessee law. The court will construe this as the plaintiffs' having conceded, for the purposes of this motion, that Tennessee law governs all three claims.

10

agreement are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." *In re Estate of Mayfield*, No. M2018-01977-COA-R3-CV, 2019 WL 4409218, at *6 n.3 (Tenn. Ct. App. Sept. 9, 2019) (*quoting Peoples Bank of Elk Valley v. Conagra Poultry Co.*, 832 S.W.2d 550, 553–54 (Tenn. Ct. App. 1991)). The defendants argue that the oral contract that the plaintiffs have described is too vague to constitute an enforceable contract. The agreement that the plaintiffs allege, however, is straightforward enough to be described concisely. The plaintiffs allege that the parties agreed to work together to market the CSFG products to Coach Doeren and Alliance employees and then to share the commissions from any resultant sales in the agreed-upon proportions. It was, moreover, agreed that CSFG would perform the work of designing the products, while Alliance and Albright would perform the on-the-ground sales work. (Docket No. 25 ¶¶ 48–51.)

While the agreement described is not complex, it does not have to be; it needs only to be definite and sufficiently clear. Alliance and Albright point out various details that are not covered by the terms that the plaintiffs have alleged, but the plaintiffs were under no obligation to set forth every unrelated term on which the parties agreed. Moreover, the question of whether enough disputable questions were resolved by the parties' agreement depends on issues of fact regarding ordinary practice in insurance marketing that the court cannot resolve here. The court, therefore, finds that, for the purposes of this motion, the plaintiffs have alleged a sufficiently definite marketing and commission-sharing contract to be enforced.

The defendants argue next that, even if a contract existed, nothing that they are alleged to have done constituted a breach. The agreement between the parties, as described in the Amended Complaint, was to market CSFG products and share commissions on any sales that were made. The defendants argue that no CSFG products were sold and, therefore, no commissions were due.

11

The question of whether a breach occurred depends, therefore, on whether the products that Albright eventually sold to/bought for Alliance for its employees were products covered by the oral agreement, giving rise to an obligation to share commissions, or whether they were simply later-created, similar products not covered by the agreement, in which case CSFG had no stake in the matter.

CSFG, as the defendants correctly point out, does not own the concept of life insurance financed by debt. *See Tax Track Sys. Corp. v. New Inv'r World, Inc.*, No. 01C6217, 2005 WL 936638, at *6 (N.D. Ill. Mar. 24, 2005) (discussing market for financed life insurance and concluding that the product "is not unique" and is offered by various vendors). Moreover, while CSFG stresses its unique role in the market for such products as a means of employee retention, it has no plausible basis for asserting that a financed life insurance policy is necessarily a CSFG product merely because it was purchased to encourage employee retention. Using benefits such as life insurance to try to lock employees in to continued employment is not a novel concept over which CSFG has the right to exercise any dominion. *See, e.g.*, *Hein v. Techamerica Grp., Inc.*, No. CIV. A. 89-2354-O, 1992 WL 221549, at *3 (D. Kan. Aug. 24, 1992) (discussing use of pension plan as "golden handcuffs" to retain executives).

The plaintiffs, however, have alleged more than merely that the defendants eventually sold/purchased a debt-financed life insurance product intended to encourage employee retention. They have alleged, "[u]pon information and belief," that "Albright and Alliance used [CSFG's] 'blueprints' to implement *the same* structured premium-financed life insurance solutions."[3]

---

[3] The defendants ask the court to take judicial notice of media coverage suggesting that this may not have been the case. (Docket No. 35 at 4.) Even if the court could take judicial notice of the media coverage's existence, the court could not accept its characterizations as fact.. *See City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 662 (6th Cir. 2005) ("We take judicial notice of the fact that the media articles cited above were published, without reaching any conclusions about their truth.") (citing Fed. R. Evid. 201).

(Docket No. 25 ¶ 78 emphasis added.) The plaintiffs have also alleged that their products are complex instruments that require substantial expertise and tailoring. For the purposes of Rule 12(b)(6), the court must accept those claims as true.

Because Count I is a breach of contract claim, it is not the court's duty to determine, in some abstract sense, how unique CSFG's products really were. The essence of contract is a meeting of the minds, and the plaintiffs have plausibly alleged that the parties reached a meeting of the minds that the plaintiffs would be entitled to commissions if Alliance purchased, for its key employees, the specific complex financial products CSFG had designed and was offering. By alleging that Albright sold his own company/employees duplicates of CSFG's specific, tailored products without sharing commissions, therefore, CSFG has alleged a breach of contract giving rise to damages. Whether the facts actually show that the purchased products were identical or substantially identical to those CSFG designed or that the parties actually had a meeting of the minds that would have entitled the plaintiffs to commissions under these facts are questions for a later stage in this litigation.

Moreover, CSFG has also stated a plausible claim for violation of the duty of good faith and fair dealing. Tennessee law imposes a duty of good faith in the performance of contracts as an implied component of the express terms of performance. *Dick Broadcasting Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 668 (Tenn. 2013). As a result of this covenant, each contracting party promises to perform its part of the contract in good faith and, in return, expects the other party to do the same. *Coleman v. Wells Fargo Banks*, 218 F. Supp. 3d 597, 606–07. (M.D. Tenn. 2016) (Crenshaw, J.). The purpose of the implied duty is (1) to honor the reasonable expectations of the contracting parties and (2) to protect the rights of the parties to receive the benefits of the agreement into which they entered. *Cadence Bank v. The Alpha Trust*, 473 S.W.3d

13

756, 769 (Tenn. Ct. App. 2015) (citation omitted). CSFG has alleged that it and Alliance/Albright entered into an agreement pursuant to which they would work together to market CSFG products to Alliance employees. If Albright, on behalf of Alliance, engaged in those joint efforts in bad faith, merely to benefit from CSFG's labor and expertise by having CSFG design products for Alliance to purchase elsewhere, that is a plausible claim of bad faith performance actionable under Tennessee law.

**2. Statute of Frauds.** The defendants argue next that, even if Count I has otherwise alleged a plausible claim for breach of contract, that claim is barred by the statute of frauds. Tennessee's statute of frauds provides that "[n]o action shall be brought . . . [u]pon any agreement or contract which is not to be performed within the space of one (1) year from the making of the agreement or contract . . . unless the promise or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person lawfully authorized by such party." Tenn. Code Ann. § 29-2-101(a). The defendants argue that, insofar as the plaintiffs have adequately described an oral agreement to market debt-financed life insurance policies, that agreement was unenforceable pursuant to that provision because the actions covered by the contract, by their very nature, would have taken more than a year to accomplish.

Tennessee courts, however, have cautioned that the one-year provision of the statute of frauds—Tenn. Code Ann. § 29-2-101(a)(5)—should be "construed very narrowly." *In re Estate of Reed*, No. E2015-02372-COAR3-CV, 2016 WL 4443699, at *4 (Tenn. Ct. App. Aug. 22, 2016) (quoting *Price v. Mercury Supply Co.*, 682 S.W.2d 924, 932 (Tenn. Ct. App. 1984)). Pursuant to that narrow reading of the statute,

> [t]he question is not what the probable, expected, or actual performance of the contract may be, but whether, according to the reasonable interpretation of its terms,

14

> it requires that it should not be performed within the year. Unless the court, looking at the contract in view of the surroundings, can say that in no reasonable probability can such agreement be performed within the year, it is its duty to uphold the contract.

*Id.* (quoting *Price*, 682 S.W.2d at 932). Based on the allegations of the First Amended Complaint, the court cannot conclude that the statute of frauds would forbid the oral contract described. Whether the parties' performance could be reasonably completed within a year depends on both the nature of the agreement, including the commission structure, as well as the realities of the underlying financial instruments. Reading the allegations in the light most favorable to CSFG and Lee, the parties entered into an agreement to pursue and complete the sale of policies in the immediate future, within the year allowed by the statute of frauds.[4] The court therefore will not dismiss Count I on statute of fraud grounds.

## B. Breach of NDA

The defendants argue that the court should dismiss Count II because the plaintiffs have failed to identify the confidential information that the defendants allegedly used. Specifically, they argue that, insofar as Alliance ended up using information that overlapped with information assembled by CSFG, that information was available from other sources—such as the relevant lenders and insurers or Alliance's own employees—and therefore was not confidential.

"Confidential information, like trade secrets[5], does not include information that is generally available in the trade or easily available from sources other than the employer . . . .." *Hinson v.*

---

[4] Because the court concludes that the defendants have not shown that Count I should be dismissed under the statute of frauds even if the underlying contract was oral, the court will not consider the plaintiffs' alternate argument, that various emails between the parties, taken together, constitute a written contract or a memorialization of the oral contract.

[5] The terms "confidential information" and "trade secret" are not synonymous, but there is only a "fine line" between them, with many of their elements overlapping. *Hauck Mfg. Co. v. Astec Indus., Inc.*, 376 F. Supp. 2d 808, 814 (E.D. Tenn. 2005). Accordingly, the case law from one area may be instructive when considering the other.

15

*O'Rourke*, No. M2014-00361-COA-R3-CV, 2015 WL 5033908, at *3 (Tenn. Ct. App. Aug. 25, 2015) (citing *Vantage Tech., LLC v. Cross*, 17 S.W.3d 637, 645 (Tenn. Ct. App. 1999); *Amarr Co. v. Depew*, C/A No. 03A01–9511–CH–00412, 1996 WL 600330, *4–5 (Tenn. Ct. App. Oct. 16, 1996)). Many of the facts that CCFG compiled, therefore—such as the availability of certain insurance policies or loans from particular vendors—would not, in isolation, be protectable as confidential.

CSFG, however, does not base its claim on those isolated facts, but rather on the designs of its financed insurance products. The viability of CSFG's argument hinges in significant part on the complexity, novelty, and proprietary nature of its products—issues on which the court must, at this stage, take CSFG at its word, as long as its claims pass the threshold test of plausibility. Admittedly, confidential information "does not exist simply because a producer has no competitors or even because it has produced a novel product." *Wright Med. Tech., Inc. v. Grisoni*, 135 S.W.3d 561, 593 (Tenn. Ct. App. 2001) (citing *Koehring Co. v. E. D. Etnyre & Co.*, 254 F. Supp. 334, 339 (N.D. Ill. 1966)). Rather, where the information claimed to be confidential is a "product design or process," it must be one that "remains generally unknown in the industry"—or, at the very least, some aspect of the design or the context of its use must be unknown. *Id.* (citing *Koehring*, 254 F. Supp. at 339). Complexity and novelty, however, play a role in that analysis, because a complex, novel design is more likely to truly be a secret than a design that has previously been used or that is so simple that it could be easily discovered independently by a competitor. The burden will ultimately be on CSFG to show that what it offered Alliance was not simply an unremarkable or easily discoverable variation on well-established premium financing practices. At this stage, however, it has sufficiently alleged that replicating its products amounted to the use of its confidential information.

16

Finally, the defendants argue that the plaintiffs have failed to allege that they were harmed by the alleged NDA breach. *See Ingram*, 215 S.W.3d at 374 (listing damages as a requirement for a breach of contract claim). The plaintiffs have argued, however, that, if the breach had not occurred, Alliance would have had to rely on CSFG to obtain the products it desired. Therefore, Alliance would have been unable to pursue its desired strategy without paying commissions to CSFG. Those allegedly lost commissions are sufficient damages to support a breach of contract claim. The court, accordingly, will not dismiss Count II.

## **C. Breach of Fiduciary Duty Related to a Joint Venture**

The defendants argue that the court should dismiss Count III because the plaintiffs have failed to adequately allege the existence of a joint venture or other source of a fiduciary duty that Alliance and Albright could have violated. "In order to recover for breach of fiduciary duty, a plaintiff must establish: (1) a fiduciary relationship, (2) breach of the resulting fiduciary duty, and (3) injury to the plaintiff or benefit to the defendant as a result of that breach." *In re Estate of Potter*, No. W2016-01809-COA-R3-CV, 2017 WL 4546788, at *2 (Tenn. Ct. App. Oct. 11, 2017) (quoting *Ann Taylor Realtors, Inc. v. Sporu*, No. W2010–00188–COA–R3–CV, 2010 WL 4939967 at *3 (Tenn. Ct. App. Dec. 3, 2010)). The defendants' argument is a challenge to the first element.

"A joint venture is an association of persons with intent, by way of contract, express or implied, to engage in and carry out a single business [venture] for joint profit, for which purpose they combine their efforts, property, money, skill, and knowledge, but without creating a partnership in the legal or technical sense of the term." *Via v. Oehlert*, 347 S.W.3d 224, 230 (Tenn. Ct. App. 2010) (quoting *Robertson v. Lyons*, 553 S.W.2d 754, 757 (Tenn. Ct. App. 1977)). "A joint venture is similar, but not identical, to a partnership, and has been described by [the

17

Tennessee] Supreme Court as 'something like a partnership, for a more limited period of time, and a more limited purpose.'" *Messer Griesheim Indus. v. Cryotech of Kingsport, Inc.*, 45 S.W.3d 588, 605–06 (Tenn. Ct. App. 2001) (quoting *Fain v. O'Connell*, 909 S.W.2d 790, 792 (Tenn. 1995)). Aside from their more limited scope, joint ventures are, at least generally speaking, "governed by the same rules of law as those governing partnerships." *Id.* (citing *Federated Stores Realty, Inc. v. Huddleston*, 852 S.W.2d 206, 212 (Tenn. 1992)). Accordingly, just as partners have fiduciary duties to one another, joint venturers—within the limited scope of their venture—have fiduciary duties as well. *See Walsh v. BA, Inc.*, 37 S.W.3d 911, 917 (Tenn. Ct. App. 2000) (discussing breach of fiduciary duty claims in the partnership setting).

The defendants argue that the plaintiffs have failed to allege a joint venture because Tennessee law requires a joint venture to consist of parties on equal footing and with joint control over the property and business at issue. It is true that some cases have suggested that a joint venture requires "an equal right on the part of each [party] to control both the venture as a whole and any relevant instrumentality." *Mathes v. DRD Knoxville Med. Clinic*, No. E2010-01809-COA-R3CV, 2011 WL 1402879, at *9 (Tenn. Ct. App. Apr. 13, 2011) (quoting *Dewberry v. Maddox*, 755 S.W.2d 50, 56 (Tenn. Ct. App. 1988)). Other cases, however, have clarified that, "even without joint control of the operations that produce profits," a joint venture can arise where parties "establish relationships that will result in a sharing of profits, each with the other." *Messer Griesheim Indus., Inc. v. Cryotech of Kingsport, Inc.*, 131 S.W.3d 457, 471 (Tenn. Ct. App. 2003) (quoting *Memphis Nat. Gas Co. v. Pope*, 161 S.W.2d 211, 213 (Tenn. 1941)). As is often the case in fledgling businesses, each party brought different things to the affiliation between CSFG and Alliance; CSFG understood the debt-financed life insurance field and controlled the tools necessary for designing the products, while Alliance had connections to the North Carolina market.

18

The plaintiffs, however, have adequately alleged that the companies (and the individuals representing them) entered into a joint, profit-sharing venture that would give rise to a fiduciary duty akin to the duties of a partner, albeit more limited in scope.

The defendants have also argued that Count III should fail under the statute of frauds. That argument is unavailing with regard to this count for the same reasons it fails with regard to Count I. The record is not yet sufficient to allow the court to conclude that the agreements alleged here fall within the statute's narrow scope. The court, accordingly, will not dismiss Count III.

## IV. CONCLUSION

For the foregoing reasons, the defendants' Motion to Dismiss (Docket No. 29) will be denied.

An appropriate order will enter.

                                           _____
                                           ALETA A. TRAUGER
                                           United States District Judge