# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| **COOL SPRINGS FINANCIAL GROUP,** ) | |
| **LLC, and JESSE A. LEE,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | |
| ) | **Case No. 3:19-cv-00964** |
| **ANDREW S. ALBRIGHT and** ) | **Judge Aleta A. Trauger** |
| **ALLIANCE LIFE USA, INC. d/b/a** ) | |
| **NATIONAL AGENTS ALLIANCE,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM

Before the court is the Motion for Summary Judgment (Doc. No. 128) filed by defendants

Andy S. Albright and Alliance Life USA, Inc. ("ALU"),[1] seeking judgment in their favor on all

claims set forth in plaintiffs Cool Springs Financial Group, LLC ("CSFG") and Jesse Lee's Second

Amended Complaint ("SAC") (Doc. No. 123). For the reasons set forth herein, the motion will be

granted in part and denied in part.

## I.    FACTS[2]

The plaintiffs filed their original Complaint in the Chancery Court for Williamson County,

Tennessee in September 2019, asserting state law claims for breach of contract, breach of fiduciary

---

[1] Although he is identified in original and amended Complaints as "Andrew S. Albright," the defendants represent that Albright's first name is actually "Andy." (Answer to SAC, Doc. No. 125, at 1 n.1; *id.* ¶ 4.) Likewise, although the plaintiffs allege that ALU does business as "National Agents Alliance," the defendants assert that National Agents Alliance is not a trade name of ALU. (*Id.* at 1 n.1.)

[2] The facts for which no citation is provided are undisputed for purposes of the defendants' summary judgment motion, unless otherwise indicated, and are drawn either from the pleadings or the plaintiffs' Response (Doc. No. 199) to the defendants' Statement of Undisputed Material Facts ("SUMF") (Doc. No. 187).

duty, and unjust enrichment. (Doc. No. 1-1.) The defendants removed the case to this court on the basis of diversity jurisdiction, and, after various challenges to the pleadings on both sides, the litigation of multiple discovery disputes, and repeated extensions of deadlines, the plaintiffs' SAC was filed in July 2023. It brings claims under state law for breach of an oral agreement, breach of a written non-disclosure agreement ("NDA"), and breach of fiduciary duty. (Doc. No. 123.) The defendants now seek summary judgment on all claims.

### A. The Parties

CSFG is a Tennessee limited liability company headquartered in Williamson County, Tennessee. Its CEO and owner is Sam Watson. CSFG is an insurance agency. It characterizes itself as a "premium finance life insurance intermediary" that sells "premium financed life insurance policies" through its agents. (SAC ¶ 12.)

Plaintiff Jesse Lee is a Williamson County resident who was formerly employed by CSFG as an executive vice president.

Andy Albright was at all relevant times a North Carolina citizen and resident; he is now domiciled in Florida. ALU is a North Carolina corporation headquartered in Burlington, North Carolina. Albright is the sole shareholder of ALU.

Lee and Albright grew up in the same part of North Carolina and knew of each other due to that proximity. Lee eventually moved to Tennessee. Albright attended North Carolina State University ("NC State") and maintained ties with the school.

### B. Premium Financed Life Insurance

Premium financed life insurance ("PFLI"), which the plaintiffs also call a "premium financed solution" or "premium finance solution," is basically a life insurance policy for which the premiums are financed by a loan. (Doc. No. 133-1, Lee Dep. 15; *see also* Doc. No. 135-1, Expert Report of Richard Weber and Gerard Vanderzanden (hereafter, "Defs.' Expert Report") at 4

(explaining that "[p]remium financed insurance is what its name indicates: insurance (whether life, workers compensation, property, or otherwise) for which the premiums are financed").)[3]

While premium finance solutions vary widely in terms of how they are structured, each consists of two primary components: a life insurance policy and a funding mechanism (through a third-party lender) to pay the premiums on the policy. (Doc. No. 134-1, Watson Expert Dep. 13–14.)[4] As Weber and Vanderzanden explain in their Report:

> Premium financing involves taking out a third-party loan to pay premiums. As with any other loan, the lender charges interest at floating short-term rates determined by the credit markets, the creditworthiness of the borrower, and the duration of a rate guarantee. The borrower, often [but not necessarily] the insured, either pays only the interest in regular installments—or larger payments of interest and principal until the debt is satisfied or the insured passes away. . . . .
>
> Premium financing can be paid off by the borrower with cash, from the policy's death benefit at the (generally premature) borrower's death, or is effectively retired and exchanged for a policy loan from the insurance company using the policy as collateral.

(Defs.' Expert Report 5.)

---

[3] In their SUMF, the defendants support many statements by citing the Expert Report prepared jointly by the defendants' retained experts. The plaintiffs object to each statement supported by such a citation on the basis that the Report "it is not sworn to, and thus not admissible evidence" and "therefore cannot be considered by the Court under Fed. R. Civ. P. 56(c)(1)(A)." (*See, e.g.*, Doc. No. 199, Pl.'s Resp. SUMF Nos. 3, 5–9, 11, 13, 14, 17, 127, 162.)

These objections are unsupported by the Federal Rules of Civil Procedure, which were amended *more than a decade ago* to provide that a party asserting that a fact either cannot be or is genuinely disputed must support that assertion by "citing to particular materials in the record," including such things as "documents" and "other materials." Fed. R. Civ. P. 56(c)(1)(A). While some of the materials listed are, by their nature, made under oath (such as depositions and declarations), there is no requirement that the materials on which a party relies be "sworn." Rather, the Rules provide that a "party may object that the material cited to support or dispute a fact *cannot be presented in a form that would be admissible in evidence*"—not that it *is not presented* in such form at the summary judgment stage. Fed. R. Civ. P. 56(c)(2). The court, therefore, disregards these objections in their entirety.

[4] Sam Watson was deposed twice—first as the Rule 30(b)(6) corporate representative for CSFG (Doc. Nos. 136-1, 137-1 (Vols. I and II) and a second time as one of CSFG's designated experts (Doc. No. 134-1).

Sam Watson similarly explained:

> PFLI encompasses a broad swath of products and solutions which involves [sic] an insured who acquires a life insurance policy that includes a "cash value" component and a lender who provides financing to pay the premiums for the policy and then takes as collateral the "cash value" of the policy. . . .
>
> [Typically, p]remiums paid for the policy are partially placed in an account where they earn interest or returns based upon a guaranteed rate of return in the policy, a securities index's performance, or some combination of the two. That "cash value" can be accessed by the insured, or can be used as collateral for loans.

(Doc. No. 198-1, Watson Decl. ¶¶ 4–5.)

The basic goal of a PFLI policy is for the cash value to grow more quickly than the cost of financing the loan (*i.e.*, the accruing interest), resulting in net gain to the borrower. (Defs.' Expert Report 5–6; *see also* Watson Decl. ¶ 4 (referring to this net gain as "positive arbitrage").) The solutions may be attractive to individuals with high net worth but illiquid assets, as well as to individuals who want more coverage than they would otherwise be able to afford if they had to pay the premiums on their own. (Watson Decl. ¶ 4.) In addition, PFLI policies are sometimes employed by organizations as a means to retain "key" employees. (Defs.' Expert Report 12–13.)

PFLI financing involves risk as well possible reward. To secure the loans extended for payment of the premiums, lenders typically require collateral, which usually consists of the policy itself as well as other assets, such as real estate and marketable securities, if the cash value of the policy is insufficient to fully secure the lender. (Defs.' Expert Report 7 & n.6.) If the amount of the debt increases to more than the value of the policy, then the net unsecured amount of the loan increases and the lender will require the borrower to post more collateral. (*Id.*; *see also* Doc. No. 132-1, Coulter Dep. Vol. I, at 253–54.) The amount of the debt increases if the accruing interest is rolled into the debt rather than being paid down. (Defs.' Expert Report 7 & n.6.)

The most common type of insurance policy used for PFLI is Indexed Universal Life ("IUL"), which typically consists of a "combination of term life insurance and a tax-favored

accumulation account." (Defs.' Expert Report at 9; Doc. No. 137-1, Watson Rule 30(b)(6) Dep. Vol. II, at 167.) The value of the IUL policy is tied to "some particular index" (Doc. No. 136-1, Watson Rule 30(b)(6) Dep. Vol. I, at 17), such as the S&P 500 (Defs.' Expert Report 9; Lee Dep. 16). While IUL products offered by different insurers are similar, "they are not necessarily identical," as "some provide greater potential returns than others, and there are varying floors, caps, and riders." (Watson Decl. ¶ 5.) IUL products are highly regulated.

It is undisputed that the PFLI policies at issue in this case were all IUL policies.

"Split dollar life insurance arrangements" are agreements "between two parties who agree to split the payment of premiums and the benefits of a life insurance policy." (Defs.' Expert Report 12.) In the employment context, for example, the employer typically pays the premiums on a policy to benefit a "key employee," so long as the employee agrees to remain with the employer for a certain period of time (*Id.* at 13.) The parties refer to these types of arrangement as "golden handcuff" polices. (*See, e.g.*, *id.*.)[5] Typically, in such situations, the employee actually owns the policy, but the employer pays the premiums, with those payments treated as loans to the employee. "Normally, the employee is required to pay the employer market-rate interest on the loan" and to repay the loan itself, either upon the termination of employment or upon the employee's death, from the proceeds of the insurance policy. (*Id.* at 13; *see also* Doc. No. 198-12, Arias Expert Rep. 2, 4, 6.)

---

[5] The term "golden handcuffs" was first used in 1976 and refers to strategies used by companies to encourage valued employees to remain with the employer. PFLI policies bought by the employer to benefit key employees if they remain employed for a certain period of time are just one form of "golden handcuffs." (Defs.' Expert Report 13.) Others include such things as "promises of enhanced retirement income [and] disability benefits." (*Id.*)

### C.    CSFG's Process

CSFG was a PFLI "intermediary." (SAC ¶ 12.) As of 2017, the PFLI business was highly competitive, with "a lot of people" in the business. (Doc. No. 136-1, Watson Rule 30(b)(6) Dep. Vol. I, at 30.) However, according to the plaintiffs, intermediaries that specialize in PFLI are not "commonplace" in the industry (Watson Decl. ¶ 6), and CSFG was one of the two largest. (Watson 30(b)(6) Dep. Vol. I, at 30.)

As the intermediary, CSFG is the entity that puts together the total package—the insurance policy and the financing for the premiums—to sell to its customers. (*See* Lee Dep. 19–20.) Watson explained that CSFG's process generally "began with CSFG determining how much insurance a potential insured needed to acquire and then determining which carrier's policies offered the best potential for accumulating 'cash value.'" (Watson Decl. ¶ 8.) CSFG's position is that, to make that determination, it "relied upon work previously commissioned from an actuary that identified which carrier's policies generated the greatest historical returns for a given type of insured, based upon the insured's age, health, and insurance needs." (*Id.* ¶ 9.) CSFG does not state that it commissioned this work for each customer every time it made a proposal to a customer, nor does it indicate when this "previously commissioned work" took place.

In any event, once CSFG's agent obtains the personal financial and health information from a potential customer, the agent then obtains life insurance "illustrations" from potential insurance carriers. (*Id.* ¶ 11.) The illustrations vary, based on the policy features and riders selected by the CSFG agent as most "likely to create the best outcome for the insured" and based on the proposed premium payment schedules. (*Id.* ¶ 12.)[6] Another significant part of CSFG's "design process"

---

[6] IUL policies, unlike term life policies, do not call for pre-structured monthly premium payments. Instead, "the insured pays what the insured wants, when the insured wants to pay it (subject to carrier limits), with the death benefit and cash value increasing when a new premium is paid. Riders that result in higher 'cash value' amounts . . . increase the likelihood of positive

involves contacting potential lenders and negotiating the structure of possible loans, with attention to the interest rates, collateral requirements, and term length, as well as to whether the interest on the loans is to be capitalized or paid as it accrues. (*Id.* ¶ 13.) CSFG maintains relationships with certain borrowers and is familiar with their typical terms, conditions, and rates. (*Id.*)

Based on all of these inputs, CSFG creates a "hypothetical loan scenario" for a potential client, projecting what the PFLI "solution" will look like in real numbers. (*Id.* ¶ 14.) Watson explained that each hypothetical loan scenario constitutes an "individualized blueprint of a single PFLI solution, showing its policy, its funding, and the cash value available to be drawn down over time," and multiple such scenarios are typically generated for a single potential customer, thus allowing the customer to evaluate different options and decide what best suits the customer's needs. (*Id.* ¶ 15.)

The next step is to engage a third party to obtain medical records and run lab tests, after which CSFG can submit a formal application to the selected insurance carrier and a formal loan application to the lender. Once the lender approves financing, the loan is funded, and the loan proceeds are used to fund the first premium, which puts the policy into place. The insured assigns the cash value of the policy as collateral for the loan, and, if the lender requires it, the insured posts additional collateral. (*Id.* ¶¶ 16–19.) Optimally, "[a]s premiums continue to be paid from the loan, the cash value of the insurance increases. If the insured lives long enough, the cash value of the policy should eventually outpace the loan balance, creating positive arbitrage, and so that the insured receives a profit." (*Id.* ¶ 20.) And CSFG receives compensation on the transaction through a commission on the sale of the insurance policy. Watson also explained that, when a group

---

arbitrage and . . . decrease the likelihood of an insured having to post collateral beyond the policy's cash value account." (Watson Decl. ¶ 12.)

transaction is contemplated for numerous employees, the planning and the funding of the insurance become significantly more complex. (*Id.* ¶¶ 23, 24.)

### D.      Lee's Contacts with Albright

Lee began working for CSFG in March 2017. (Lee Dep. 30.) Although he had learned something about premium financed policies from the banking side in his former employment, he had never sold a premium financed life insurance policy before going to work for CSFG and had not received formal training in this admittedly complex field. (Lee Dep. 50–51.)[7]

The same month he began his employment with CSFG, he contacted Albright to request a meeting. (*See* Doc. No. 198-3, at 1.) They were not immediately able to figure out a time to meet, and Lee suggested a telephone call instead, initially telling Albright only that he wanted to discuss insurance. (*Id.* at 2.) He finally told Albright that he "need[ed] an intro/partner for NC State," with which he understood Albright had a "ton of credibility." (*Id.* at 4.) He proposed to show Albright "what [he had] to offer" and, if Albright liked it, to "partner up." (*Id.*) In the same message, Lee asked Albright if he would be willing to sign a nondisclosure agreement ("NDA"). (*Id.*) Albright agreed. Lee emailed him the proposed NDA, which Albright eventually signed and returned. (Lee Dep. 117.)

Lee confirmed that he had not used an NDA with any other potential customers at that point, and he, himself, never signed a non-disclosure agreement with CSFG before going to work for the company. (Lee Dep. 45.) CSFG never placed any restrictions on his ability to use its confidential information, other than by verbally conveying to him, during meetings, to "keep confidential information confidential." (Lee Dep 46.)

---

[7] He closed on the sale of two such policies during his employment with CSFG. (Lee Dep. 68.)

Regarding why he proposed the NDA to Albright, Lee was not "looking at Mr. Albright as a customer" but, instead, as a "potential partner who has a very well-known name within the life insurance business." (Lee Dep. 118.) The NDA defines the term "Confidential Information" as "[a]ll trade secrets, operational and strategic information, information technology, financial data, business plans, customer information, structural information, and market information" disclosed by CSFG to the "Disclosee." (Doc. No. 123-1, NDA ¶ 1.) Excepted from the definition is any information "already known to Disclosee at the time it is disclosed" and information that "becomes or has become publicly known through no wrongful act of Disclosee." (*Id.* ¶ 2.)

The NDA requires the Disclosee to retain any Confidential Information in confidence, "using the same standard of care used by Disclosee to protect its own confidential and proprietary information, to prevent the disclosure of Confidential Information to any third party." (*Id.* ¶ 4.) In addition, it bars the Disclosee from disclosing the information to any third party and from using the Confidential Information for "any purpose" other than the furtherance of a possible business relationship with CSFG. (*Id.* ¶¶ 4–5.) In addition, the NDA required the "Disclosee" either to return or destroy any Confidential Information upon termination of the agreement or on CSFG's written request, and the agreement was envisioned to terminate on the date the business relationship between CSFG and ALU terminated. (*Id.* ¶¶ 7–8.) The NDA is expressly to be governed by Tennessee law. (*Id.* ¶ 11.)

After the NDA was executed, Lee and Albright met face-to-face in North Carolina on June 8, 2017, at the offices of National Agents Alliance ("NAA"). (Lee Dep. 33.) Lee testified that, at that meeting, the two reached an oral agreement that they would "partner together in the pursuit of the sale of structured premium finance life insurance" (the "oral agreement" or "commission agreement"). (*Id.* at 33–34.) The general idea of the oral agreement, according to Lee, was that

> [CSFG] would structure the premium finance policies and coordinate all third parties coming together. Jointly. Mr. Albright and [Lee] would sell with the primary responsibility being [Lee's] to "sell" the prospective clients. And Mr. Albright's primary responsibility was to bring prospective clients to the table.

(Lee Dep. 34.) The commission resulting from any sale would be split among CSFG, Lee, and Albright, with CSFG to receive 20% and Lee and Albright each to receive 40% of the total commission. (*Id.*)

Asked whether Albright ever agreed that, "if he ever sold a premium finance policy, without the involvement of Cool Springs, . . . he would pay a commission to Cool Springs," Lee responded: "In my opinion, yes, based on our agreement on June 8, 2017. That was the whole premise of – was the sale of premium finance by both parties." (*Id.* at 37.) He elaborated:

> [T]he facts of your question are a hypothetical because we had an agreement in place. We were a partnership. So, there was never a Mr. Albright and Jesse Lee as individuals moving forward. We had a partnership going forward in Cool Springs Financial Group.

(*Id.* at 38.) Under the oral agreement, according to Lee, Albright simply did not have the option of "moving forward by himself," without involving CSFG. (*Id.* at 39–40; *see id.* at 75 (agreeing that Albright never expressly stated that, if he sold a premium financed policy outside of the CSFG context, he would pay Lee and Cool Springs a commission, because the "agreement was to sell together")). Because, in Lee's mind, they agreed to sell PFLI together, the thought of Albright's selling it on his own never occurred to Lee. He "trusted [their] agreement." (Lee Dep. 74.) They never discussed an end date to the partnership agreement. (*Id.* at 42, 74.)

No one else was present during the portion of the meeting during which the oral agreement was reached, and neither Lee nor Albright ever documented in writing the terms of the oral agreement. (Lee Dep. 130–31.)

During the meeting, Lee first explained to Albright "how premium finance worked," because Albright was not familiar with the concept. (Lee Dep. 120.) Information about how PFLI

works generally was not confidential or proprietary to CSFG, but how CSFG structured its deals was confidential. (*Id.*) Lee gave information to Albright during the June 8 meeting that he viewed as confidential, including going over "multiple loan scenarios with him," *i.e.*, the spreadsheet with the "yellow bar across the top." (Lee Dep. 119.) Lee contends that any such loan scenarios are confidential and proprietary. He also explained to Albright "the structure" of PFLI transactions, "how we marry all the components together." (Lee Dep. 119–20.) They spent a lot of time on "the inner workings of that loan scenario, and how each column would communicate with each other, and how each piece of the puzzle, whether it be the lending piece, the policy, the growth within, the interest rate component, how all of those communicated with each other and . . . formed the ultimate package that we put together," all of which he considered confidential. (*Id.* at 122.)

Lee also explained some of the components CSFG used that were unique, including policy riders that, in some cases, only CSFG had access to, as well as the "future income piece" and the possibility of borrowing against the policies—"not borrow internal, which is very well known, but borrow external, away from the policy [to] allow the policy to continue to grow." (*Id.* at 120–21.) He also explained how CSFG "marketed these products from the golden handcuff standpoint." (*Id.* at 121.) Lee believed that this particular use of PFLI was a secret at the time. (*Id.* at 121–22.)

During the meeting, Lee showed Albright an article explaining what the University of Michigan had put in place for a coach there, as a retention measure. (*Id.* at 132.) They also talked about how PFLI could be used in estate planning, for "high net worth folks" whose assets are illiquid, and Albright expressed interest in using PFLI for his own estate planning and for "retain[ing] his key guys." (*Id.* at 133–34.) They did some "bouncing around" and "clearly laid out [their oral] agreement." (*Id.* at 134.) As Lee explained it, again:

The terms surrounding our agreement were the commission breakdown, Cool Springs Financial gets 20 percent. Albright and I split my cut of Cool Springs, my agreement with Cool Springs, which will be 40 apiece on any and all transactions. And the primary roles of the parties involved would be Albright and who he deems to be a representative and his affiliated companies would attempt to bring potential clients, prospects to the table. He and I would, in conjunction with each other, sell together. It would be my primary role to be the point of contact to get into the meat and potatoes *per se* of the products. And it would be Cool Spring's responsibility to put it all together in a package and how it would be presented.

(Lee Dep. 135.)[8]

In this context, they talked about the NC State athletic coaches with whom Albright had contact as prospects and, in general, about the "pursuit of other high profile or high net worth folks [Albright] had connections with." (*Id.* at 134, 135.) Albright agreed to reach out to various NC State coaches. (Doc. No. 140-1, Albright Rule 30(b)(6) Dep. 106–07, 118.)[9]

Lee returned to NAA's offices the next day, June 9, 2017, to meet Albright's associate, Keith Hall, and to collect information on certain employees, so he could put together a golden-handcuffs proposal for Albright, and he met briefly with Albright again that afternoon. (Lee Dep. 142, 148.) After that, he did not meet face-to-face with Albright or any of his associates again. (Lee Dep. 148–49.) However, for a period of time, Lee communicated almost daily with Albright's assistant, Amber Bowen. (Lee Dep. 150.)

---

[8] Watson testified that Lee told him that he and Albright had "agreed upon a partnership" pursuant to which they would split the commissions Lee would otherwise receive, while CSFG would get its normal 20% plus "general agent overrides," that CSFG would to "all the back office services for them, design work, assistant arranging, financing, et cetera. Everything we always did. And Mr. Albright would bring his relationships, and [Lee's] job was to sell them." (Doc. No. 136-1, Watson Rule 30(b)(6) Dep. Vol. I, at 36–37.) Lee purportedly told him that he and Albright were "working exclusively together." (*Id.* at 37.)

[9] Albright does not deny that an oral agreement was created, but his stated understanding of it was that, if he introduced Lee to the NC State coaches, and Lee convinced the coaches (or NC State) to buy a PFLI package from CSFG, and CSFG delivered the package and closed the deal, then Albright would receive a share of the resulting commission. (Albright Dep. 106–07, 118–19, 120, 133.) He denies that that contract was breached.

After the initial meeting, Albright appeared excited about the prospect of working with Lee to obtain PFLI policies both for himself, as an estate planning measure, and for his key employees. (*See, e.g.*, Doc. No. 198-3, at 4–12 (6/8/2017–6/9/2017 text messages between Albright and Lee).) Lee, with the assistance of Albright's assistant, spent the next couple of months gathering information and putting together proposals for Albright for premium financed solutions for estate planning purposes for Albright and Albright's wife, and "golden handcuff" PFLI for his key agents. (Lee Dep. 142; Lee Decl. ¶¶ 9–11.) These efforts ultimately led to the "creation of the individual loan scenarios and policy illustrations for each of the potential insureds." (Lee Decl. ¶ 13.) He emailed these documents to Albright. (*Id.*)

As part of this process, Lee compiled information provided by Albright's assistant and prepared a "census," or a compilation of the potential insureds' basic information, such as dates of birth and annual income, as well as "information about the status of the transaction and the potential carrier, with such information coming from CSFG." (Lee Decl. ¶ 13; *see also* Doc. No. 198-2, at 21, Lee Decl. Ex. C.) The defendants state that this census did not contain any of CSFG's confidential information, citing Watson's deposition testimony regarding a completely different document (apparently summarizing the life insurance policies already in force for Albright and his wife). (*See* SUMF ¶ 107 (citing Doc. No. 134-1, Watson Expert Dep. 57).) When Watson was shown what he identified as an incomplete census, he indicated that it contained CSFG's confidential or proprietary information, insofar as it contained "work product" and was not "something that we would be giving out to people." (Watson Expert Dep. 58–59; *see also* Watson Decl. ¶ 25 ("CSFG considers [the census and] other documents created in the course of a PFLI transaction to be confidential, and does not share them with competitors. CSFG also considers the manner in which it designs or structures a given PFLI transaction . . . to be confidential. These

documents and structural information demonstrate CSFG's thoughts and work, and—if reviewed by another intermediary or carrier with experience in PFLI—will give that intermediary or carrier both a model of a given transaction, and a competitive advantage.").) Lee also characterized the document as confidential and the product of a substantial amount of work, time, and effort on his part. (Lee Dep. 234; Doc. No. 198-2, Lee Decl. ¶ 17.) Watson agreed only that, insofar as the census contained Albright's employees' names and salaries, that information was confidential to Albright and his employees, not to CSFG. (Watson Expert Dep. 59–60.)

CSFG and Lee selected Penn Mutual Life Insurance Company ("Penn Mutual") as the insurer for the proposed golden handcuff transactions. (Lee Decl. ¶ 14.) Lee provided Albright with "policy summaries" for Albright, his wife, and approximately 30 key employees. (*See, e.g.*, Doc. No. 155-1, at 6–46.) Watson explained that CSFG created policy summaries (or illustrations) by plugging information about a specific individual into Penn Mutual's software. (Watson Expert Dep. 61–63.) Lee stated that the summaries are also "confidential information as far as [CSFG] is concerned." (Lee Dep. 234.) Watson explained that, to generate the illustrations, the CSFG agent has to select the "policy features and riders likely to create the best outcome for the insured" and "create a proposed premium payment schedule." (Watson Decl. ¶ 12.)

CSFG did not engage an actuary specifically to do any of the work on the proposed Albright sales. Instead, CSFG relied on work previously commissioned from an actuary that identified which carriers' policies generated the best historical returns under given parameters, and it tailored its recommendations accordingly. (Watson Decl. ¶¶ 8–9; Watson Expert Dep. 85–86; Watson Rule 30(b)(6) Dep. Vol. I, at 51–53, 91–92.) The loan scenarios Lee provided summarize potential projections of an individual's proposed policy's performance over time, showing the "policy, its funding, and the cash value available to be drawn down over time" (Watson Decl. ¶ 15.)

As part of the PFLI "design transaction," Lee and CSFG proposed to Albright the use of a "split dollar plan with a special purpose entity." (Lee Decl. ¶ 15.) That is, Lee proposed that Albright create a new limited liability company ("LLC") that would obtain a bank loan. When the PFLI policy was purchased, the LLC would lend those funds (the "premium loan") to the insured for the purpose of paying the policy premiums. (*Id.*) The insured would "pledge the cash value of the policy to the LLC as collateral for the premium loan, and the LLC would assign that pledge to the bank to secure the [original] loan from the bank" to the LLC. (*Id.*) Albright agreed to this proposal and delegated Keith Hall, his companies' CFO, to set up the appropriate LLC. (*Id.* ¶ 16.)

By late July 2017, the "design process" had progressed to the point that the key employees identified on Lee's census were contacted for the purpose of setting up medical exams and lab tests. Through this process, Lee was working "full time" on keeping track of that data and on "designing and proposing PFLI solutions for the key employees" Albright had identified and for Albright and his wife. (*Id.* ¶ 17.) Albright went so far as to submit a formal application for insurance to Penn Mutual, and CSFG had identified BankDirect as the expected lender. (*Id.* ¶ 18.)

Also during the summer of 2017, Albright reached out to NC State coaches. (Doc. No. 140-1, Albright Dep. 195–98; *see also* Doc. No. 198-3, at 12, 48.) Lee and CSFG prepared a loan scenario and Policy Summary for at least one of them, which were sent to Albright to facilitate his discussions with the coach. (Lee Decl. ¶ 19; Doc. No. 198-5.) Nothing came of these efforts.

On August 7, 2017, Albright had his CFO, Keith Hall, send Lee an email asking him to "pump the brakes until the end of the month" and asking whether the application for Albright's policy had already been submitted. (Doc. No. 189-19, at 18.) Shortly after that email, Hall sent Lee a follow-up email explaining that, while they were "still excited about the opportunity," they were "doing due diligence" on making the changes to Albright's policies and had "scheduled a

meeting at the end of this month with some of our financial advisors and estate planners," but they did not want to "submit the application for any new policy" until after that meeting. (*Id.*) Lee responded by reminding Albright and his team that Albright's application had been submitted "weeks ago" and that underwriting was complete. (*Id.* at 17.)

In mid-August 2017, Albright had one of his employees send the census, policy summary, and loan scenarios Lee had sent him to his financial advisor, Gary Carroll, for his review. (Albright Dep. 229–31.) According to Albright, all of his "wealthy advisors" [sic] were telling him that CSFG's proposal involved "a hell of a lot of risk to get involved with, and it just looked like leverage on top of leverage on top of leverage." (Albright Dep. 248.) In short, he was getting cold feet.

From Lee's perspective, Albright was becoming less and less responsive and communicative by late August and into September 2017. (Lee Dep. 156; *see also* SAC ¶ 69.) On September 12, 2017, Albright sent Lee a text that stated:

> Jesse, all of my wealthy [sic] advisors are recommending that I not leverage anything. No loans or minimum loans and no leveraging life insurance. They're all suggesting I keep hammering my own business and growing. I'm glad to talk to you more, but I don't want to be screamed at anymore. I don't really have time for that. Love to talk to you, but not going to argue.

(Albright Dep. 244.) Lee understood this text to mean that Albright was not going forward with their purported joint venture. (Lee Dep. 173–74.) Though the parties dispute how far CSFG had progressed toward finalizing Albright's package and those for his key employees, there is no dispute that, at this point, none of the proposed transactions had reached the stage of completion or closed. By the end of September, Albright had ceased communications with Lee and CSFG. (*Id.* at 156; *see also* SAC ¶ 69.)

### E.      Albright Proceeds to Purchase PFLI Without Plaintiffs' Involvement

Meanwhile, however, apparently sometime during the first part of August 2017, Albright asked his long-time associate Jim Henson, president of ALU, whether he knew of any large, reputable insurance companies that did PFLI and were knowledgeable about it. Henson told him that he knew Pacific Life Insurance Company ("Pacific Life") was in that market and that Henson had a contact there. (Doc. No. 144-1, Henson Dep. 12–13.) According to Henson, Albright asked him if he could "check them out," and Henson agreed to reach out to Pacific Life. (*Id.* at 13.) Henson testified that he knew that Albright was interested in doing some "key person" policies for the purpose of retaining "key people" but that Albright was not sure if he wanted to use premium financing to pay for it or some other means instead. (*Id.* at 14.)

Henson reached out to his contact at Pacific Life, Brian Butakites. An internal Pacific Life emailed dated August 17, 2017, from Butakites to his colleague, Julie Mirza, states that his old friend Jim Henson had reached out to him on behalf of his firm, NAA. As Butakites explained to Mirza:

> [NAA] ha[s] been approached by another firm to purchase large amounts of life insurance on Jim and other key executives within NAA utilizing a premium finance concept. Jim approached me on two items. They know very little about premium finance and want to know is this a good deal for his company or not. And second, if so, possibly this could become a PL case since JIM knows our reputation for outstanding products. The potential here is millions in premium.

(Doc. No. 123-7, at 4–5.) In the course of communications with Pacific Life about this possibility, Henson eventually shared Lee's census, showing the 30 or so "key" agents for whom Albright was interested in retaining key person policies. The contacts with Pacific Life went far enough that Pacific Life issued illustrations showing the pricing for these policies, and NAA contracted with Pacific Life to enable it to sell Pacific Life IUL policies in PFLI arrangements. However, it is undisputed that neither Albright nor any other agent associated with Albright ever closed on the

sale of any life insurance policies with Pacific Life. (*See generally* Henson Dep. 21–36, 69–106.) "Things sort of died out" with Pacific Life by October 2017. (*Id.* at 104–05.)

Sometime in early 2018, months after Lee and Albright had stopped communicating, Mike Duncan, as Vice President over distribution for National Life Group ("NLG")[10] reached out to Andy Albright for the purpose of "recruit[ing] him and recruit[ing] his group to sell [NLG] products." (Doc. No. 173-1, Duncan Dep. 29.) According to Duncan, he had attempted on previous occasions to recruit Albright, but the timing had not worked out. It was also Duncan who raised the issue of PFLI with Albright—who was initially resistant to the idea. (*Id.* at 42–43.)

Ultimately, however, Albright and his companies closed on a series of transactions with NLG that included (1) Albright's becoming an "approved appointed agent" with NLG/LSW in June 2018; (2) Albright's purchasing personal life insurance policies for himself and his wife, funded through an irrevocable trust; (3) Albright's facilitation of the purchase of PFLI policies for 66 individuals, including key agents and the spouses of some of them, through his company called Alliance Commission Enhancement, LLC, using NLG as the insurance company issuing the policies, Northstar Funding Alliance ("Northstar") as the intermediary, and Global One Financial ("Global One") as the lender, in mid-January 2019; and (4) Albright's earning a substantial commission on the sales of these policies, as the NLG-approved agent who facilitated the purchase of them.

It is also undisputed that, when Albright first began discussing the possibility of pursuing PFLI policies through NLG, Albright forwarded to Mike Duncan and other NLG personnel copies of (1) a modified version of the "census" originally created by Jesse Lee; (2) a spreadsheet entitled

---

[10] NLG is affiliated with—and, for purposes of the defendants' motion, indistinguishable from—Life of the Southwest ("LSW") insurance company.

"7.24.17 Overview of Andy + Jane Albright Life Insurance," showing the policies already in place governing Albright and his wife; (3) a Penn Mutual Policy Summary that Sam Watson of CSFG had prepared for Albright, using Penn Mutual's proprietary software, in the summer of 2017; and (4) at least two different "Loan Scenarios" created by Jesse Lee for Albright in 2017. (*See* Doc. No. 177-1.)

Albright maintains that he did not forward the documents to Duncan and the other NLG agents to provide an example of what he wanted; instead, he intended to provide CSFG's policy summaries and loan scenarios as examples of what he did *not* want. (Albright Dep. 270.) Although the email exchanges among them establish that NLG's agents at least reviewed the CSFG documents, Duncan asserted that they that did not use them except as a "reference point," meaning that NSG "used them to give us the dollar amounts that we're trying to insure each and every person," but, otherwise, NSG had its "own set of . . . proposals" and did not need to use a competitor's." (Duncan Dep. 210–11.)

At the same time, however, Duncan acknowledged that it was always helpful to see quotes from a competitor:

> Well, any time you do . . . premium finances or any time you compare life insurance policies, we like to see what the competition is, given that's very common in our place. You know, show me what they have proposed, and let's see if we can't, you know, get close to what you're doing and show you why ours may be better than what . . . they're offering.

(*Id.* at 69.)

There is no evidence, however, that any of CSFG's documents were forwarded either to Northstar, the intermediary, or Global One, the lender, during the course of the PFLI transaction, except that a modified version of the original "census" spreadsheet created by Lee appears to have been sent to Northstar to identify the names of individuals for whom policies were sought and the desired face value of each policy. (*See* Doc. No. 198-16, at 19.) Kim Coulter, Northstar's former

CEO, testified that, if Northstar had received anything from CSFG, they would have considered it "trash." (Coulter Dep. Vol. I, at 231–32.)

It appears to be undisputed that Albright (or Keith Hall) forwarded the CSFG email attachments to Kim Coulter at Northstar in the fall of 2019, sometime after ALU had been served with this lawsuit. (Doc. No. 141-1, Hall Dep. 146–48; Coulter Dep. Vol. I, at 227–28.) It is unclear why.

###### F.      The Motion for Summary Judgment

Lee learned about Albright's purchase of NLG's policies, facilitated by Northstar, in or around July 2019 when he read about it in a magazine article. (Docket No. 123 ¶¶ 167–68.) He and CSFG filed this lawsuit in September 2019 and eventually filed the SAC in July 2023. As set forth above, the SAC asserts claims for (1) breach of the oral agreement to jointly sell structured premium financed life insurance products and share the resulting commissions, (2) breach of the NDA, and (3) breach of fiduciary duty, premised upon the presumption that the oral commission agreement also constituted a joint venture agreement. (Doc. No. 123.)

The defendants now seek summary judgment on all of the claims on the basis that they are not supported by the applicable law as applied to the undisputed facts. Specifically, with respect to the oral agreement, they argue that: (1) the plaintiffs' lacked the authority to transact business or sell insurance in North Carolina at the time the oral agreement was allegedly formed, because neither Lee nor CSFG was licensed to "transact insurance business" in North Carolina, as a result of which they cannot recover based on the purported breach of the oral agreement; (2) no breach of the oral agreement as actually formulated actually occurred; (3) there was no meeting of the minds and, thus, no contract formed that permanently restricted Albright from buying or selling PFLI except with the plaintiffs' involvement and the sharing of commissions with the plaintiffs; (4) even if such a contract were formed, it is unenforceable under North Carolina's implementation

of the statute of frauds; and (5) Albright is entitled to summary judgment on the breach of fiduciary duty claim, again because the purported oral agreement is unenforceable under the statute of frauds and because no fiduciary relationship existed between him and Lee and no joint venture was formed. The defendants assert that they are entitled to summary judgment on the claim for breach of the NDA, because (1) Albright personally was not bound by the NDA and, therefore, cannot be individually liable for its breach; (2) the defendants did not breach the NDA, because none of the documents they shared consisted of the plaintiffs' confidential information protected by the NDA; and (3) the plaintiffs cannot show that any purported breach of the NDA caused them damages.

The defendants filed a Memorandum of Law in support their motion (Doc. No. 129), the SUMF (Doc. No. 130), and, as indicated above, a substantial quantity of evidentiary material. The plaintiffs filed their Response to the SUMF (Doc. No. 199), Response in opposition to the Motion for Summary Judgment (Doc. No. 200), and more evidentiary material. The defendants filed a Reply (Doc. No. 202).

## II.     STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying and citing specific portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations—that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). If the non-moving party asserts that a fact is genuinely disputed, it generally "must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Pittman*, 901 F.3d at 628 ("The nonmoving party 'must set forth specific facts showing that there is a genuine issue for trial.'" (quoting *Anderson*, 477 U.S. at 250)). The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and the weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

## III.    DISCUSSION

### A.    The Oral Agreement

The defendants assert that, under Tennessee choice-of-law rules, North Carolina law applies to the oral agreement, which was formed in North Carolina. (Doc. No. 129, at 17–18.)[11]

---

[11] The pagination assigned by the court's electronic filing system is not consistent with the pagination supplied by the defendants to their Memorandum, because they failed to assign a page number to the first page. The court employs herein the electronic page numbers.

The plaintiffs concede this point. (*See* Doc. No. 200, at 13.) The court, therefore, accepts without analysis the application of North Carolina law to the oral agreement.

Under North Carolina law, "[t]he elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Parker v. Glosson*, 641 S.E.2d 735, 737 (N.C. Ct. App. 2007) (quoting *Poor v. Hill*, 530 S.E.2d 838, 843 (N.C. Ct. App. 2000)). For a valid contract to exist, "at least two parties [must] manifest an intent to be bound" by an agreement. *Croom v. Goldsboro Lumber Co.*, 108 S.E. 735, 737 (N.C. 1921). In law, such mutual assent to an agreement "is customarily described as a 'meeting of the minds.'" *Parker*, 641 S.E.2d at 737 (citing *Charles Holmes Mach. Co. v. Chalkley*, 55 S.E. 524, 525 (N.C. 1906) ("The first and most essential element of an agreement is the consent of the parties, an a*ggregatio mentium*, or meeting of two minds in one and the same intention, and until the moment arrives when the minds of the parties are thus drawn together, the contract is not complete, so as to be legally enforceable.").

While an oral agreement may be valid, "a 'statute of frauds' requires certain contracts be written and signed to be enforceable." *Smith Debnam Narron Drake Saintsing & Myers, LLP v. Muntjan*, No. COA23-324, --- S.E.2d ----, 2024 WL 157675, at *2 (N.C. Ct. Appl. Jan. 16, 2024) (citing *Durham Consol. Land & Improv. Co. v. Guthrie*, 21 S.E. 952, 953 (N.C. 1895)), *writ allowed*, 896 S.E.2d 626 (N.C. 2024). That is, even assuming an oral contract was validly *formed*, the failure to satisfy an applicable statute of frauds is an affirmative defense to the *enforceability* of such a contract. *See id.* ("[E]ven if the parties formed a valid contract, it is unenforceable because it fails the statute of frauds."); *see also Yeager v. Dobbins*, 114 S.E.2d 820, 822 (N.C. 1960) ("[T]he statute of frauds is an affirmative defense and must be pleaded."); *Parker*, 641 S.E.2d at 738 (2007) (noting that "a contract to sell or convey an interest in real property is

*enforceable* if the essential terms of the parties' agreement are evidenced in writing and that writing is 'signed by the party to be charged'" (quoting N.C. Gen. Stat. § 22–2)); *Durham Consol. Land & Improvement Co.*, 21 S.E. at 953 (explaining that, "if A contracts in writing to sell a tract of land to B, whose promise to pay is not in writing, A would be bound to perform, but B would not, if he saw proper to avail himself of the statute [of frauds]"), *quoted in Parker* 641 S.E.2d at 738.

North Carolina has enacted a statute of frauds that requires agreements in restraint of trade within that state to be in writing. Specifically:

> No contract or agreement hereafter made, limiting the rights of any person to do business anywhere in the State of North Carolina shall be enforceable unless such agreement is in writing duly signed by the party who agrees not to enter into any such business within such territory . . . .

N.C. Gen. Stat. Ann. § 75-4. This provision has long been held to apply to all types of restraints of trade, including employment non-compete agreements and exclusive distributorship agreements, among others. *See, e.g.*, *Sonotone Corp. v. Baldwin*, 42 S.E.2d 352, 354 (N.C. 1947) (finding that a challenged employment non-compete agreement satisfied the writing requirement of § 75-4); *Dealers Supply Co. v. Cheil Indus., Inc.*, 348 F. Supp. 2d 579, 584 (M.D.N.C. 2004) ("The North Carolina Supreme Court has applied this statute to distributorship agreements, holding that 'a contract whereby a person, firm or corporation is made exclusive distributor for the State of North Carolina, precluding the manufacturer from doing business in North Carolina otherwise than through this single channel, is void unless the party so limited or restricted agrees thereto in writing.'" (quoting *Radio Elecs. Co. v. Radio Corp. of Am.*, 92 S.E.2d 664, 666 (N.C. 1956))).

Generally, "to constitute an enforceable contract within the statute of frauds, the written memorandum, though it may be informal, must be sufficiently definite to show the essential elements of a valid contract." *Smith Debnam*, 2024 WL 157675, at *3. "[S]eparate writings may

be considered together to satisfy the statute of frauds requirement." *Id.* (quoting *Crocker v. Delta Grp., Inc.*, 481 S.E.2d 694, 696 (N.C. Ct. App. 1997)). Email signatures have generally been held to satisfy the signature requirement. *Id.* (citing *Powell v. City of Newton*, 684 S.E.2d 55, 60 (N.C. Ct. App. 2009)).

Among other defenses based on contract formation, the defendants here contend that, even if a contract was formed that prohibited Albright and any of his companies from selling PFLI solutions to any individual or entity except in partnership with Lee and CSFG (which defendants deny), such a restraint on trade is subject to the statute of frauds, and the plaintiffs admit that no writing exists that is signed by Albright and memorializes the essential terms of the purported agreement.[12] In their Response, the plaintiffs argue that (1) N.C. Gen. Stat. Ann. § 75-4 does not apply, because the "agreement's express terms do not contain any restriction on Albright's ability *to do business*, let alone a 'substantial' limitation" (Doc. No. 200, at 31); (2) even if it does apply, "when a portion of an agreement is unenforceable, North Carolina Courts may 'blue pencil' the offending provision" (*id.* at 30 (quoting *MarketPlace 4 Ins., LLC v. Vaughn*, No. 22 CVS 7588, 2023 WL 2229694, at *7 (N.C. Super. Feb. 24, 2023))); (3) "there are writings by Albright confirming he would work with Plaintiffs and split the profits, and the Court could 'blue pencil' away any unenforceable restrictive covenants" (*id.* at 31); and (4) "Defendants are attempting to describe the limitations imposed by Albright's fiduciary duties as contractual restrictions, in hopes the Court will mistake the two, and strike down both. But 'a contracting party may have fiduciary duties to his counterparty that are separate and distinct from his contractual duties'" (*id.* (quoting *Kixsports, LLC v. Munn*, No. 17 CVS 16373, 2021 WL 1241099, at *6 (N.C. Super. Apr. 1,

---

[12] Nor did Lee himself ever put the purported agreement in writing.

2021))).

*1.    Section 75-4 Applies to the Oral Commission Agreement*

To address the plaintiffs' arguments, the court must first determine what the terms of the purported oral agreement are, from the plaintiffs' perspective. As the defendants point out, this has been somewhat of a moving target. In the SAC, the plaintiffs allege that Lee and Albright agreed as follows:

> A. CSFG, Lee and Albright would work together to sell premium financed life insurance.
>
> B. Albright and his companies would be responsible for locating potential customers, introducing Lee and CSFG to them, and facilitating the sale of premium financed life insurance products--while CSFG/Lee would be responsible for designing and implementing the premium financed solutions to be sold to the customers.
>
> C. The commissions from the sale of any premium financed life insurance products would be split as follows: 40% to Mr. Albright; 40% to Mr. Lee and 20% to CSFG.
>
> D. The intended customers for such sales were the NC State Coaches, the estate planning trust controlled by Albright and his wife, the key employees and affiliated independent contractor insurance agents for Albrights' business ventures (such as the Alliance), and any other person identified by Albright as a potential customer or client.
>
> 57. In accordance with established industry practice, it was also understood (and agreed upon, as an implicit term) that, because CSFG was the general agent for the sale of any premium financed life insurance products, CSFG would retain any "general agent overrides" paid by the carrier(s) to CSFG for these sales.

(SAC ¶¶ 56–57.)

As Lee summarized it more succinctly when he was deposed, he and Albright reached an oral agreement that they would "partner together in the pursuit of the sale of structured premium finance life insurance." (Doc. No. 133-1, Lee Dep. 33–34.) To do this,

> [CSFG] would structure the premium finance policies and coordinate all third parties coming together. Jointly. Mr. Albright and [Lee] would sell with the primary responsibility being [Lee's] to "sell" the prospective clients. And Mr. Albright's primary responsibility was to bring prospective clients to the table.

(Lee Dep. 34.) The commission resulting from any sale would be split among CSFG, Lee, and Albright, with CSFG to receive 20% and Lee and Albright each to receive 40% of the total commission. (*Id.*)

Although Lee repeatedly acknowledged that he and Albright never discussed what would happen if Albright sold PFLI policies without Lee's or CSFG's involvement, he contends that it was simply understood, based on the agreement to sell PFLI together, that, if Albright "ever sold a premium finance policy, without the involvement of Cool Springs, . . . he would pay a commission to Cool Springs." (*Id.* at 37; *see id.* ("That was the whole premise of – was the sale of premium finance by both parties."); *id.* at 38 ("We were a partnership.").) He elaborated:

> From day one, there was a partnership of two people and – a company in Cool Springs and a company in Albright's company. . . . Because you're coming from the standpoint of Mr. Albright moving forward by himself. That wasn't an option in our agreement.
>
> Q      So did Mr. Albright agree that if he ever sold a premium finance policy, he would do it in conjunction with Cool Springs?
>
> A      That was my understanding of our agreement 100 percent.
>
> Q      Okay. And how long was that term binding on Mr. Albright? Did he say, "Ten years from now if I sell a premium finance policy" –
>
> A      There was not a time frame put on it.
>
> Q      Okay. So, did Mr. Albright ever explicitly agree with you that if he ever sold a premium finance policy sometime in the future he would pay a commission to Cool Springs?
>
> A      We never had that -- that specific conversation.

(*Id.* at 39–40.)

Although the plaintiffs claim there was only one oral agreement, it appears that, from Lee's perspective anyway, there were actually at least two: (1) an agreement that he and Albright would

only work together to sell PFLI solutions and would share commissions on such sales[13] and (2) an agreement to form a joint venture.[14] Only the first—the oral commission agreement—is at issue here. This agreement, according to the plaintiffs, included an agreement to work together to sell PFLI to various NC State coaches and to "key employees" of Albright's company, NAA. (*See* Doc. No. 200, at 6.) And the record establishes that Albright made efforts to introduce Lee to some NC State coaches and others and that he considered buying PFLI for himself and key employees through Lee and CSFG, before he eventually decided that he did not want to do business with Lee and CSFG and told Lee as much.

However, according to the plaintiffs, Albright also bound himself to Lee to sell PFLI *only* through Cool Springs as intermediary, using Lee. He was not allowed to sell PFLI through any other intermediary without breaching the oral agreement. Although the plaintiffs contend that this agreement did not substantially limit Albright's ability to do business in the state of North Carolina, the court finds the situation closely analogous to distribution agreements to which North Carolina state courts and federal district courts have applied § 75-4. In *Dealers Supply Co.*, for example, the parties entered into an oral agreement pursuant to which the plaintiff, Dealers, a wholesale distributor of flooring, countertop, and sink materials, would have the exclusive right to distribute the defendant's "solid surface counter top and sink product known as Staron" for a period of seven years within a specific geographic area including North Carolina, thus limiting the defendant's ability to sell its product within the state through any other distributor. Because the

---

[13] Curiously, Lee does not indicate whether, if he sold a PFLI policy to any individual to whom Albright had not introduced him, he was required by their agreement to share the commission with Albright.

[14] Lee used the term "partnership" in his deposition, but he appears to have done so in a colloquial, rather than a legal, sense. The SAC alleges the formation of a joint venture, which is "in the nature of a kind of partnership." *Jones v. Shoji*, 444 S.E.2d 203, 205 (N.C. 1994). The alleged formation of a joint venture agreement is discussed below.

agreement was not reduced to writing, the court found it unenforceable under § 75-4. *Dealers Supply*, 348 F. Supp. 2d at 584–85 ("As Dealers' complaint alleges it was orally given exclusive rights to purchase and sell Staron within the state of North Carolina, Defendants correctly conclude the oral distributorship agreement between the parties is unenforceable under the statute."); *see also Radio Elecs. Co.* 92 S.E.2d at 666 ("The oral contract as alleged prohibits defendant from making any sale or distribution of its said products in North Carolina other than to and through plaintiff as exclusive distributor in the territory. . . . True, the oral contract as alleged does not exclude defendant from engaging in business in North Carolina, but it does prohibit defendant's right to do business except through plaintiff as its exclusive distributor. Thus, it limits substantially defendant's right to do business in North Carolina. Hence, under G.S. § 75-4, the alleged oral contract is void and unenforceable."); *Norlin Indus., Inc. v. Music Arts, Inc.*, 313 S.E.2d 166, 169 (N.C. Ct. App. 1984) (finding alleged oral franchise agreement "void and unenforceable" under § 75-4, where it purported to prohibit the "plaintiff from distributing Lowrey organs within a certain territory . . . to any of [the defendants'] competitors or from opening any new stores of its own" and thus "substantially limited the plaintiff's right to do business in this area, except through the defendant as its exclusive distributor").

In Lee's and Albright's alleged agreement, Albright was not permitted to sell PFLI policies anywhere, including within North Carolina to his own employees, except through CSFG as intermediary. This alleged agreement substantially limited Albright's ability to act as an agent selling PFLI policies within the state of North Carolina. The court finds, therefore, that the agreement is governed by § 75-4, and the plaintiff's half-hearted arguments to the contrary are not persuasive.

        2.      *The Essential Terms of the Oral Commission Agreement Are Not in Writing*

The plaintiffs claim that writings exist confirming that Albright "would work with Plaintiffs and split the profits." (Doc. No. 200, at 31.) The writings to which the plaintiffs refer are text messages, the most direct of which is Albright's message on June 9, 2017, stating:

> I really appreciate you inviting me in on half that commission. That makes it so ethical so sensible and a done deal. We're donna do some big deals!!

> Have you thought about a strategy for me to hit the coaches. I ain't scared[.]

(Doc. No. 198-3, at 11.)

For a writing to satisfy the statute of frauds, it only needs to "set forth the contract's essential terms. As part of the required essential terms, however, the writing or writings must show the intent and obligation of the party to be bound to the contract." *Howlett v. CSB, LLC*, 596 S.E.2d 899, 902 (N.C. Ct. App. 2004) (citing *Computer Decisions, Inc. v. Rouse Office Mgmt. of N.C.*, 477 S.E.2d 262, 265 (N.C. Ct. App. 1996)). The text message above references an obligation the contract imposed on Lee—to share with Albright half the commission he would otherwise receive. It does not establish that *Albright* incurred any responsibility other than to introduce Lee to some possible leads. While Albright's text messages imply that the parties reached some kind of agreement for the split of commissions if N.C. State coaches or any of Albright's employees or key agents closed on PFLI transactions with Lee and CSFG, they by no means explicitly recognize that Albright agreed only to deal with the plaintiffs. *Accord Smith Debnam*, 2024 WL 157675, at *4 ("Taken as a whole, Defendant's emails imply that he agreed to [act as guarantor], and indeed the trial court found that Defendant verbally promised to do so. But while spoken words and implications can form a contract, they cannot satisfy the statute of frauds. Defendant's emails are not sufficiently definite to show the essential elements of a valid contract because they do not

express a clear, written promise by Defendant that he would pay Plaintiff." (internal citations and quotation marks omitted)).

### 3. The "Blue Pencil" Rule Does Not Apply

Under North Carolina law, "blue-penciling is the process by which a court of equity will take notice of the divisions the parties themselves have made [in a restrictive covenant], and enforce the restrictions in the territorial divisions deemed reasonable and refuse to enforce them in the divisions deemed unreasonable." *Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 784 S.E.2d 457, 461 (N.C. 2016) (alteration in original; internal quotation marks and citation omitted). "North Carolina has adopted the 'strict blue pencil doctrine' under which a court cannot rewrite a faulty covenant not to compete but may enforce divisible and reasonable portions of the covenant while striking the unenforceable portions." *Id.* at 460.

The court has located no cases addressing the application of the blue-pencil doctrine outside the context of written covenants not to compete, nor any cases that apply it to a contract rendered unenforceable for failure to satisfy the statute of frauds. The plaintiffs have not explained how it would save their claim in this case.

In sum, the oral commission agreement, as articulated by the plaintiffs, prohibited Albright from acting as agent for the sale of PFLI policies through any intermediary other than CSFG. As such, the purported agreement substantially limited his ability to sell PFLI in the state of North Carolina and, therefore, falls within the scope of N.C. Gen. Stat. Ann. § 75-4, which requires any agreement that "limits the rights of any person to do business anywhere in the State of North Carolina" to be in writing to be enforceable. Because there is no writing or combination of writings signed by Albright that articulate the essential elements of the obligations he incurred as part of this oral agreement, the oral commission agreement is unenforceable as a matter of North Carolina law.

4.    *Contract Formation*

Because the statute of frauds applies to the oral agreement as characterized by the plaintiffs, the court has no real need to address the question of whether such an oral agreement was validly formed in the first place. The court nonetheless notes that, even if the oral agreement as characterized by the plaintiffs were *not* subject to the statute of frauds, the plaintiffs have presented effectively no evidence of a meeting of the minds on the exclusivity element of the alleged agreement. That is, Lee himself repeatedly acknowledged that he and Albright never discussed what would happen if Albright purchased or sold PFLI policies through some intermediary other than CSFG. Instead, Lee simply assumed that he and Albright were on the same page, having agreed to work as "partners" to sell PFLI. Even accepting as true Lee's version of their discussions, however, the mere fact that he and Albright agreed to work together would not necessarily imply that Albright agreed at the same time never to work with anyone else. In short, the plaintiffs have pointed to no competent evidence in the record that would permit a reasonable fact finder to conclude that the parties formed a binding agreement to work exclusively together to sell PFLI.

Moreover, it bears noting that the parties actually do agree (at least for purposes of the summary judgment motion) that they formed an oral contract to "work together to sell PFLI to various persons (including NCSU coaches and 'key employees' of Albright's Alliance company), and to split the commissions" on any sales of PLFI that they did achieve together. (Doc. No. 200, at 6; *see also* Doc. No. 129, at 4–5.) This version of the agreement, insofar as it did not actually bind Albright to work exclusively with the plaintiffs to sell PFLI in North Carolina, would not be subject to a statute of frauds and, therefore, would not be rendered unenforceable by the absence of a writing signed by Albright. The plaintiffs, however, do not allege a breach of this agreement. The evidence indicates that Albright introduced or attempted to introduce several third parties (including at least one NC State coach) to Lee, though none of those introductions resulted in sales,

and that Albright seriously considered purchasing PFLI for himself and key employees through CSFG but ultimately decided not to. In other words, Lee and CSFG did not succeed in making any sales through Albright. Nothing about the parties' agreement, however, obligated Albright to close on the deals proposed by Lee and CSFG.

For all of these reasons, the defendants are entitled to summary judgment on the plaintiffs' claim that the defendants breached the oral commission agreement.

### B. The Joint Venture Agreement and Breach of Fiduciary Duty

Under North Carolina law, as suggested above (*supra*, Note 13), a joint venture is a kind of partnership, and, "although a partnership and a joint [venture] are distinct relationships, they are governed by substantially the same rules." *Jones v. Shoji*, 444 S.E.2d 203, 205 (N.C. 1994) (quoting *Pike v. Trust Co.*, 161 S.E.2d 453, 460 (N.C. 1968)). North Carolina courts look to partnership law, codified in the Uniform Partnership Act, N.C. Gen. Stat. Ann. §§ 59-31 through 59-73, for guidance in resolving issues involve joint ventures. *See Jones*, 444 S.E.2d at 205.

"A contract, express or implied, is essential to the formation of a partnership. A partnership may be formed by an oral agreement." *Potter v. Homestead Preservation Ass'n*, 412 S.E.2d 1, 5–6 (N.C. 1992) (internal quotation marks and citations omitted). Thus, no statute of frauds applies to the formation of a joint venture/partnership. And, while the existence of a joint venture generally is a question of fact, summary judgment is appropriate when the facts, viewed in the "light most favorable to plaintiffs," failed to "establish that the parties' business relationship was a joint venture." *Se. Shelter Corp. v. BTU, Inc.*, 572 S.E.2d 200, 205 (N.C. Ct. App. 2002).

The plaintiffs' basic position is that Albright "agreed to sell [PFLI]" with Lee and CSFG and "form[ed] a joint venture to do so." (Doc. No. 200, at 2.) The SAC alleges that Albright agreed to work with CSFG and Lee for the "common purpose of offering, selling and implementing structured premium finance solutions which CSFG would formulate," that they agreed to share

commissions resulting from those sales; and that this agreement constituted a "joint venture." (SAC ¶¶ 198–200.) The plaintiffs allege that, because they entered into a joint venture with Albright, all the members of the joint venture owed a fiduciary duty to the other members of the joint venture. (*Id.* ¶ 201.) In particular, the SAC asserts that Albright was required to refrain from competing with the joint venture, from converting any business opportunities of the joint venture to his own use, and from using the confidential information he learned from the plaintiffs to further his own interests. (*Id.* ¶¶ 203–04.)

Citing *Volumetrics Medical Imaging, Inc. v. ATL Ultrasound, Inc.*, 243 F. Supp. 2d 386 (M.D.N.C. 2003), the defendants argue that the plaintiffs must establish the existence of a pre-existing fiduciary relationship in order to establish that a joint venture was formed. (*See* Doc. No. 129, at 22 ("Plaintiffs have it backwards. Joint ventures do not create fiduciary relationships. Instead, a fiduciary relationship is a prerequisite to forming a joint venture.").) In their Response, the plaintiffs assert that the existence of a joint venture gives rise to a fiduciary relationship between the parties, relying on *Reason v. Barfield*, No. 22 CVS 36, 2023 WL 2638178 (N.C. Super. Mar. 24, 2023), in which a North Carolina trial court denied the defendant's motion for judgment on the pleadings, finding that the plaintiff "adequately alleged the existence of either a partnership or a joint venture." *Id.* at *6. In a footnote, the court rejected the defendant's argument that the plaintiff's joint venture theory failed because he failed to allege the existence of a fiduciary relationship. The court stated, "it is the existence of a partnership or joint venture that creates the fiduciary relationship, not the other way around." *Id.* at *6 n.3. The plaintiffs assert that *Reason* is "an accurate statement of the law" and that the defendants are not justified in relying on the contrary holding in *Volumetrics Medical Imaging*.

This court finds that, irrespective of which gives rise to the other, it is clear that the mere existence of a *contract* does not, *per se*, give rise either to a joint venture or a fiduciary relationship, and the plaintiffs' conclusory assertion that the agreement between Albright and the plaintiffs constituted a joint venture does not make it so. The North Carolina Supreme Court has explained:

> A joint venture is an association of persons with intent, by way of contract, express or implied, to engage in and carry out a single business adventure for joint profit, for which purpose they combine their efforts, property, money, skill, and knowledge, but without creating a partnership in the legal or technical sense of the term. . . .
>
> Facts showing the joining of funds, property, or labor, in a common purpose to attain a result for the benefit of the parties in which each has a right in some measure to direct the conduct of the other through a necessary fiduciary relation, will justify a finding that a joint adventure[15] exists.
>
> To constitute a joint adventure, the parties must combine their property, money, efforts, skill, or knowledge in some common undertaking. The contributions of the respective parties need not be equal or of the same character, but there must be some contribution by each coadventurer of something promotive of the enterprise."

*Pike v. Wachovia Bank & Tr. Co.*, 161 S.E.2d 453, 460 (N.C. 1968) (citations and internal quotation marks omitted).

Two decades later, the North Carolina revisited the same issue, noting that, while the law of joint ventures was not completely settled in North Carolina (or elsewhere), there was a growing consensus on certain points, among them the requirement that "each party to a joint venture has a right in some measure to direct the conduct of the other *through a necessary fiduciary relationship*." *Cheape v. Town of Chapel Hill*, 359 S.E.2d 792, 799 (1987) (emphasis in original). That is, "each joint venturer [must] stand in the relation of principal, as well as agent, as to each of the other coventurers. . . . " *Id.* at 799–800 (quoting 46 Am. Jur. 2d Joint Ventures § 1 (1969

---

[15] As the North Carolina Supreme Court also noted, "[t]he terms joint adventure and joint venture are synonymous." *Pike v. Wachovia Bank & Tr. Co.*, 161 S.E.2d 453, 460 (N.C. 1968) (citation omitted).

and Cum. Supp. 1986)). In other words, for a joint venture to exist, the terms of the parties' agreement must give rise to a fiduciary relationship between them. In *Cheape*, the court found that the alleged agreement between the parties "failed to place [the parties] in the relation of principal, as well as agent, as to each [other]" and, therefore, that no joint venture was created. *Id.* at 800.

Likewise, in *Southeastern Shelter Corp.*, the court cited *Pike* and *Cheape* to define the essential elements of a joint venture as "(1) an agreement to engage in a single business venture with the joint sharing of profits, (2) with each party to the joint venture having a right in some measure to direct the conduct of the other *through a necessary fiduciary relationship*." *Se. Shelter Corp.*, 572 S.E.2d at 204 (emphasis in original; citations and quotation marks omitted). Besides finding that the parties in that case did not agree to share profits, the court also found "little in the alleged agreement to indicate that it established a principal-to-agent relationship between the parties." *Id.* at 205.

Here, the terms of the alleged "partnership," as suggested above, are very vague. The plaintiffs claim only that Albright agreed to work with them to sell PFLI policies and that they would share in the commissions of any PFLI policies sold to any individuals to whom Albright introduced them, including, but not limited to, his own employees and agents and any NC State coaches. Nothing about this arrangement suggests the creation of an agency relationship running both directions between the parties.

First, although the plaintiffs assert that the agreement to share commissions satisfies the initial element required for the formation of a joint venture, an agreement to share in *commissions* is not the same as an agreement to share *profits*. *See* N.C. Gen. Stat. Ann. § 59-37(3) & (4) (distinguishing between gross returns and profits, providing that "[t]he sharing of gross returns does not of itself establish a partnership," while "[t]he receipt by a person of a share of the profits

of a business is *prima facie* evidence that he is a partner in the business"). No part of the parties' alleged agreement concerns such matters as office space overhead, salaries for support staff, travel expenses, taxes, or any of the other matters typically considered to factor into a "profits" analysis.

Even if the court were to presume that mere shared commissions equates to shared profits, the plaintiffs do not allege shared control, the second element. In their Response memorandum, the plaintiffs argue only that "the ability of all parties to control the joint venture is implied by law as part of the Commission Agreement." (Doc. No. 200, at 19.) In support of this proposition, however, they cite a case in which the parties had entered into a written agreement explicitly characterizing their relationship as a "joint venture." *Lake Colony Constr., Inc. v. Boyd*, 711 S.E.2d 742, 747 (N.C. Ct. App. 2011). The court presumed that the parties' use of the term "joint venture" implied their understanding of what that term meant. *Id.* at 748 ("We thus presume that when they entered into their contract and identified their relationship as a 'joint venture,' [the parties] took into account the law that, in a joint venture, the parties 'stand in the relation of principal, as well as agent, as to one another.'" (quoting *Se. Shelter Corp.*, 572 S.E.2d at 205)). No such presumption is warranted here.

The plaintiffs contend that the contractual requirement to "work together" also implied shared control, but they do not explain how. From the allegations in the SAC and the plaintiffs' testimony, it is apparent that Lee essentially agreed to pay a finders' fee to Albright—out of the commission that would otherwise go to Lee—for any deals the plaintiffs closed as a result of Albright's introductions. Though Lee initially contacted Albright with the hope of being introduced to NC State athletic coaches, he had no control over whom Albright might introduce to him, or when, or how. Moreover, once Albright made introductions and an initial pitch, say, for example, to the NC State coaches, nothing suggests that Albright would have had any control over

which life insurance companies Lee and CSFG would seek bids from or as to which lenders they might choose to deal with, how the deals would be structured or what the ultimate sale price (from which the commission was derived) would be. Neither party, that is, was to act as agent for the other. *Accord Se. Shelter Corp.*, 572 S.E.2d at 205 ("The ultimate decision whether to accept a job, and at what price, was left to defendants. Accordingly, there is nothing in the agreement that establishes [plaintiffs] as agents of the [defendants]. Likewise, there is nothing that establishes defendants as agents of plaintiffs.").[16]

The North Carolina Supreme Court has recognized that, "[e]ven without proof of an express agreement to form a partnership, a voluntary association of partners may be shown by their conduct," when such conduct, including the parties' "acts and declarations," "warrant[s] the inference that the parties understood that they were partners and acted as such." *Potter v. Homestead Preservation Ass'n*, 412 S.E.2d 1, 5 (N.C. 1992) (citations omitted). "[A] course of dealing between the parties of sufficient significance and duration . . . along with other proof of the fact [may] be admitted as evidence tending to establish the fact of partnership, provided it has *sufficient substance and definiteness* to evince the essentials of the legal concept, including, of course, the necessary intent." *Id.* at 5–6. In *Potter*, the court found the evidence sufficient to support the existence of a partnership where the plaintiff presented evidence of an oral agreement

---

[16] The plaintiffs do not argue that the existence of the NDA strengthens their claim that a joint venture and concomitant fiduciary relationship existed, but, in fact, its existence weighs against the finding of a fiduciary relationship. As the Fourth Circuit has recognized, "in North Carolina 'parties to a contract do not thereby become each others' fiduciaries; they generally owe no special duty to one another beyond the terms of the contract. . . .'" *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 347 (4th Cir. 1998) (quoting *Branch Banking & Trust Co. v. Thompson*, 418 S.E.2d 694, 700 (1992)); *see also Volumetrics Med. Imaging, Inc. v. ATL Ultrasound, Inc.*, 243 F. Supp. 2d 386, 406 (M.D.N.C. 2003) (finding that, because the "highly proprietary information throughout the relationship" was governed by a non-disclosure agreement, it was not evidence of a fiduciary relationship).

and "of partnership conduct—including the division of proceeds from the sale of the 400-acre parcel—corroborating that agreement," which was further buttressed by testimony regarding the plaintiff's services contributing to the partnership. *Id.* at 6.

Other cases in which joint ventures or implied partnerships have been found all similarly involved evidence of conduct on the part of both parties tending to establish the existence of a partnership or joint venture. Where such evidence is lacking, courts will find as a matter of law that no joint venture was formed. *See, e.g.*, *Best Cartage, Inc. v. Stonewall Packaging, LLC*, 727 S.E.2d 291, 299–300 (N.C. Ct. App. 2012) (finding that the plaintiff adequately alleged *de facto* partnership where he alleged "active involvement and contributions to the success of [the defendant's] business" and "a sharing of expenses, sharing of tax incentives, and a donating of employees' time for which no accounting was made" (citing *Trujillo v. N.C. Grange Mut. Ins. Co.*, 561 S.E.2d 590 (2002), as finding allegations sufficient to support partnership "where three brothers worked together to run a farm and each one provided something different to the enterprise")); *Dealers Supply Co.*, 348 F. Supp. 2d at 588 (rejecting the plaintiff's conclusory assertion of a partnership between a manufacturer and wholesaler, stating: "the facts and circumstances must justify the inference of a partnership" and that some of the relevant factors included "[c]o-ownership and sharing of any actual profits," "[h]olding an association out to the public as a partnership, the contributions of capital and state licensing," and "filing partnership tax returns and establishing partnership bank accounts," none of which existed in that case).

The evidence in this case supports a finding that (1) Lee proposed to Albright that they work together to sell PFLI and share any resulting commissions and (2) Albright initially agreed and was enthusiastic about the proposal. His enthusiasm to do business with the plaintiffs quickly waned, however, and he notified Lee by mid-September 2017, approximately three months after

Lee's and Albright's initial meeting, that he would not proceed. No deals had been done by then; no money changed hands; no joint bank account was created; no employees were shared; no resources were mingled. Lee understood that Albright no longer wanted to do business with him, but he did nothing to ask for an accounting or to suggest that Albright owed him anything (or vice versa). The evidence in this case, viewed in the light most favorable to the plaintiffs, fails to establish the existence of a joint venture.

The only support the plaintiffs offer for the existence of a fiduciary relationship is that the parties formed a joint venture and thus, by definition, a fiduciary relationship. Accordingly, because the plaintiffs cannot establish the formation of a joint venture, they also cannot show that the defendants stood in a fiduciary relationship to them. Because there was no fiduciary relationship, the plaintiffs' claim for breach of fiduciary duty fails as a matter of law.

### C.      The NDA

There is no dispute that Albright signed the written NDA and that it is, on its face, governed by Tennessee law. There is also no dispute that the plaintiffs provided to Albright documents that they consider confidential, including "(a) the structured financing solutions which Lee and CSFG had formulated for the Key Personnel and for Albright's estate planning purposes, (b) the Loan Scenario documents provided to Albright, (c) the life insurance illustration provided to Albright, and (d) the spreadsheets compiling data that were provided to Albright." (SAC ¶ 191.) It is also clear that Albright distributed some or all of these documents to others, including Pacific Life employees, NLG employees, his financial advisor (Gary Carroll), and Northstar (after this lawsuit was filed). The plaintiffs allege that Albright breached the clear terms of the NDA, both by disclosing confidential information to unauthorized recipients and by failing to return or destroy the confidential information after terminating his relationship with the plaintiffs.

The defendants argue that they are entitled to summary judgment on the NDA claims, because (1) Albright individually is not a party to the NDA and cannot be held liable for its breach; (2) the defendants did not breach the NDA, because the documents Albright disseminated were not covered by the NDA for a variety of reasons; (3) even if a breach occurred, the plaintiffs cannot establish that they suffered damages as a result.

### 1. Albright Signed the NDA as a Representative of ALU

The opening paragraph of the NDA states in full:

> Cool Springs Financial Group, LLC (hereinafter the "Company") desires to conduct business with Alliance Life USA Inc. dba National Agents Alliance and Andy S. Albright (hereinafter "Disclosee"). In order for such relationship to be meaningful, it will be necessary for Company to discuss with certain employees or other representatives of Disclosee proprietary and confidential information relating to Company's business. References to "Disclosee" shall be deemed to include any such employees and representatives.

(Doc No. 123-1, NDA at 1.) In other words, the NDA defines "Disclosee" to include both "Alliance Life USA Inc. dba National Agents Alliance" and Andy Albright, *and* "certain employees and other representatives" of "Disclosee."

The NDA then recites that, in exchange for the disclosure of confidential information and other "good and mutual consideration," "Disclosee and Company" agree upon certain measures to maintain the confidentiality of proprietary information disclosed by the "Company" to the "Disclosee," as described in more detail below. The final paragraph of the NDA, below the enumerated paragraphs setting forth the parties' obligations, states:

> IN WITNESS WHEREOF, the parties intending to be legally bound, have executed this Agreement as of the later date set forth below.

(*Id.* at 3.) Signature blocks for "Alliance Life USA, INC. DBA National Agents Alliance" and CSFG appear below that paragraph, formatted as follows:

ALLIANCE LIFE USA, INC. DBA
NATIONAL AGENTS ALLIANCE

COOL SPRINGS FINANCIAL
    GROUP, LLC

1214 Turrentine Street
Burlington, NC 28215

1000 Corporate Centre Drive, Suite 120
    Franklin, TN 37067

By:_ /s/ Andy S. Albright_____
    Andy S. Albright, CEO

By:_ /s/ Jesse A. Lee_____
    Jesse A. Lee, EVP

(*Id.*) At issue is whether Albright is personally liable for any breach of the NDA, which requires interpretation of the contract. The parties agree that this question is governed by Tennessee law, due to the choice of law provision contained in the NDA.

Under Tennessee law, in "resolving disputes concerning contract interpretation, [the court's] task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language." *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889–90 (Tenn. 2002) (quoting *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)). Determining the parties' intentions "is generally treated as a question of law because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left for a jury to decide." *Id.* at 890.

The court's "initial task in construing a contract is to determine whether the language of the contract is ambiguous." *Id.* If the contract language is *not* ambiguous, "[t]he literal meaning of the contract language controls." *Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013); *see also Franklin Am. Mortg. Co. v. Univ. Nat'l Bank of Lawrence*, 910 F.3d 270, 282 (6th Cir. 2018) (observing that where the contract language is clear and unambiguous, the literal meaning controls the outcome of the dispute because it is the best indicator of the parties' intent under Tennessee law). On the other hand, if the contract language is ambiguous, the court

applies established rules of construction to determine the parties' intent. *Planters Gin*, 78 S.W.3d at 890 (citation omitted). "Only if ambiguity remains after the court applies the pertinent rules of construction does [the legal meaning of the contract] become a question of fact." *Id.* (citation omitted). It is well settled that parol evidence regarding "the relations existing between the parties, the facts surrounding them at the time when they entered into the agreement, and also their acts subsequent thereto" may be considered by the court when interpreting an ambiguous contractual provision. *Dog House Invs., LLC v. Teal Props., Inc.*, 448 S.W.3d 905, 913 (Tenn. Ct. App. 2014) (citing *Faulkner v. Ramsey*, 158 S.W.2d 710, 711 (Tenn. 1942)).

"[I]n reviewing a contract for ambiguities, the court considers the contract as a whole." *Baptist Physician Hosp. Org., Inc. v. Humana Military Healthcare Servs., Inc.*, 368 F.3d 894, 897 (6th Cir. 2004) (citing *Williamson Cty. Broad. Co. v. Intermedia Partners*, 987 S.W.2d 550, 552 (Tenn. Ct. App. 1998)). "'A contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one. A strained construction may not be placed on the language used to find ambiguity where none exists.'" *Id.* (quoting *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975)). Nor is a contract "'rendered ambiguous simply because the parties disagree as to the interpretation of one or more of its provisions.'" *Id.* at 898 (quoting *Int'l Flight Ctr. v. City of Murfreesboro*, 45 S.W.3d 565, 570 n.5 (Tenn. Ct. App. 2000)).

Under Tennessee law, "[i]n most cases, a representative who signs a contract is not personally bound to the contract." *84 Lumber Co. v. Smith*, 356 S.W.3d 380, 382 (Tenn. 2011) (citations omitted). A representative may be personally bound "when the clear intent of the contract is to bind the representative." *Id.* (citations omitted). That is, "[w]hether or not a particular contract shows a clear intent that one of the parties was contracting as an individual or in a representative

capacity, must be determined *from the contract itself*," if possible. *Lazarov v. Klyce*, 255 S.W.2d 11, 14 (Tenn. 1953) (emphasis in original) (citation omitted).

When a representative signs under a signature block naming only the company he represents and provides his title as a sign that he is an authorized representative, he is generally considered to sign in his representative capacity only. Thus, for example, in *Anderson v. Davis,* 234 S.W.2d 368 (Tenn. 1950), the contract sued upon stated that it was "entered into between Central Coal Company, E. J. Davis, President, of Combs, Kentucky, and hereinafter referred to as 'The Company'" and was signed as follows:

Central Coal Company

By (S) E. J. Davis, President

*Id.* at 369. The court found that the president signed only on behalf of the company. *See also Bill Walker & Assocs. v. Parrish*, 770 S.W.2d 764, 770 (Tenn. Ct. App. 1989) ("A corporate officer's signature, preceded by the corporation's name and followed by words denoting the officer's representative capacity, binds only the corporation." (citing *Anderson v. Davis*, 234 S.W.2d 368, 369–70 (Tenn. Ct. App. 1950); *Wilson v. Fite*, 46 S.W. 1056, 1057 (Tenn. Ch. App. 1897))).

Conversely, in *Bill Walker & Associates*, "Mark Parrish/DBA Parco Enterprises" was identified as the "client" entering into a written agreement, and Mark Parrish signed the agreement under a signature block that likewise reflected both names. The court found that the rule established in *Anderson* provided no refuge to Mark Parrish, because "his signature is preceded by his own name in addition to his corporation's assumed name." *Id.* The court therefore found it clear from the face of the agreement itself that Mark Parrish signed the contract in both his individual and representative capacity. *Id.* Likewise, in *84 Lumber Co. v. Smith*, 356 S.W.3d 380 (Tenn. 2011), the defendant was found to have signed a guarantee in his individual capacity and his representative capacity, where the contract language unambiguously "distinguishe[d] between 'I,'

the person signing the contract, and the 'above business,'" and contained "terms and conditions that apply to both the 'applicant' and the 'personal guarantor.'" *Id.* at 383; *see id.* (noting that the first sentence of the credit application stated, "BY SIGNING BELOW I HEREBY CERTIFY THAT I AM THE OWNER, GENERAL PARTNER OR PRESIDENT OF THE ABOVE BUSINESS," and the second clause stated, "I DO UNCONDITIONALLY . . . PERSONALLY GUARANTEE THIS CREDIT ACCOUNT AND PAYMENTS OF ANY AND ALL AMOUNTS DUE BY THE ABOVE BUSINESS").

In the NDA at issue here, it may fairly be said that the term "Disclosee" is somewhat ambiguous, insofar as it is defined to include ALU and Albright as the parties with which CSFG "desires to conduct business," but also any "such employees and representatives" of "Disclosee" to whom the "Company" discloses proprietary information. (NDA at 1.) In other words, it appears that Albright and all of ALU's employees and representatives are covered by the term "Disclosee." However, no language in the body of the contract signals the parties' intention to bind Albright personally to the agreement. Moreover, the NDA does not define the term "parties," and the final paragraph and signature block obviate any ambiguity that might attend the term "Disclosee."

That is, the contract states that the "parties intending to be legally bound" have signed the agreement. (*Id.* at 3.) And just below that language, it provides signature blocks only for ALU and CSFG, not for Albright individually—nor for any of ALU's other employees or representatives covered by the term "Disclosee." By signing as "CEO" on a signature line that starts with "By" below the name of the company, Albright clearly signaled an intent to sign the NDA in his representative capacity on behalf of ALU and not in his individual capacity. Finally, if there were any ambiguity on that point, such ambiguity must be construed against CSFG as the drafter of the contract. *Accord, e.g.*, *Anderson*, 234 S.W.2d at 369 ("The contract was prepared by the

complainants' representatives not in Davis' presence, . . . and any doubt as to its construction must be resolved against the complainants.").

In short, Albright cannot be held individually liable for breach of the NDA, though it is clear that ALU may be liable for acts by Albright, as a Disclosee, who breached the agreement, if the plaintiff is ultimately able to establish such a breach (and resulting damages).

2.      *Breach of the NDA*

The NDA defines "Confidential Information" to include all "trade secrets, operational and strategic information, information technology, financial data, business plans, customer information, structural information, and market information heretofore or hereafter disclosed by Company to Disclosee." (NDA ¶ 1.) Among other exceptions not relevant here, information that "becomes or has become publicly known through no wrongful act of Disclosee" is not subject to the NDA's "obligations of confidentiality." (NDA ¶ 2(c).)

The NDA requires the Disclosee to retain Confidential Information "in confidence, exercising the same standard of care used by Disclosee to protect its own confidential and proprietary information, to prevent the disclosure of Confidential Information to any third party." (*Id.* ¶ 4.) In addition, however, Disclosee expressly agreed that it "shall not use Confidential Information for any purpose other than . . . in furtherance of its business relationship with the Company" and "that it will not use, disseminate, or in any way disclose any Confidential Information of Company to any party." (*Id.*)

Finally, the NDA requires the Disclosee to return all copies, summaries, or extracts of Confidential Information disclosed by the Company "[u]pon the written request of Company, and in any event upon termination of this Agreement." (*Id.* ¶ 7.) The NDA is deemed to terminate "on date on which Company's business relationship with Disclosee terminates." (*Id.* ¶ 8.) The NDA also provides that no waiver of any rights under the agreement shall be effective unless in writing

signed by both parties, and it incorporates an integration clause, providing that the written contract "constitutes the full and complete understanding and agreement of the parties hereto with respect to the subject matter covered herein and supersedes all prior and contemporaneous oral or written understandings and agreements with respect thereto." (NDA ¶ 10.)

While it is undisputed that Albright disseminated documents provided to him by Lee, the defendants contend that such dissemination did not breach the NDA, because the documents were either not proprietary to CSFG, not confidential to CSFG, or were no longer protected, because the plaintiffs published them as exhibits to the Complaint when they filed this lawsuit, without taking steps to protect them. (Doc. No. 129, at 27.) The defendants also assert that (1) CSFG has never required confidentiality or non-competition agreements from any of its employees; (2) it does not require all clients or potential clients to sign an NDA; (3) CSFG's claim of confidentiality is largely premised upon the "idea that Cool Springs commissioned and used actuarial studies" to guide it in selecting which life insurance policies should be proposed for Albright and his employees and that such actuarial studies are highly confidential, but the record establishes that the plaintiffs did not commission actuarial studies specifically for generating the proposals for Albright but relied, instead, on previously commissioned studies; (4) the plaintiffs added a claim in the SAC based on the defendants' failure to return their confidential information, but the plaintiffs never demanded the return of their documents and have not been able to say when the parties' relationship ended; and (5) the NDA requires only that the defendants apply "the same standard of care" ALU uses to "protect its own confidential and proprietary information," and the plaintiffs have not provided any evidence that the defendants breached that standard. (*Id.* at 28–29.)

The court finds that there is at least a question of fact as to whether the documents in question are "confidential" as that term is defined by the NDA and as to whether the defendants breached the agreement. First, as to whether the information was proprietary and confidential, the fact that some of the documents produced to the defendants by Lee incorporated "census" data provided to Lee by the defendants does not mean that the documents themselves were not proprietary and confidential, insofar as they revealed Lee's thought processes and the structure of his proposal. Although the "policy illustrations" were generated using Penn Mutual's software, they incorporated CSFG's agents' input and judgment in selecting "policy features and riders likely to create the best outcome for the insured." (Doc. No. 198-1, Watson Decl. ¶ 12.) And the creation of loan scenarios likewise allegedly required the agents' judgment and expertise in structuring the financial aspects of the transaction. (*See id.*) Watson described each loan scenario as an "individualized blueprint of a single PFLI solution, showing the policy, its funding, and the cash value available to be drawn down over time" and explained that "multiple loan scenarios are typically generated for a single potential insured, allowing the evaluation of different options by the customer and CSFG," before "obtaining final commitments from insurers and lenders." (*Id.* ¶ 15.) The transactions and their funding become more complex when they involve multiple individuals or a "group transaction." (*Id.* ¶¶ 21–22.)

Watson confirmed that CSFG considers individual loan scenarios, policy illustrations, the census, and "other documents created in the course of a PFLI transaction to be confidential, and does not share them with competitors." (*Id.* ¶ 25.) In addition, it considers the manner in which it "designs or structures a given PFLI transaction . . . to be confidential." (*Id.*) Watson further averred that such "documents and structural information demonstrate CSFG's thoughts and work, and—if reviewed by another intermediary or carrier with experience in PFLI—will give that intermediate

or carrier both a model of a given transaction and a competitive advantage." (*Id.*) He testified that, although the census reflects information provided by the potential insured, the census itself is "a compilation of data," the production of which involves significant time, effort and expense. (*Id.*) This testimony constitutes evidence that the information shared by the plaintiffs (and later disseminated by the defendants) was confidential.

As for the defendants' other arguments, the fact that CSFG never required its employees or other potential clients to sign confidentiality agreements is evidence that weighs heavily against the plaintiffs' assertions that the disclosed documents were confidential, but it does not obviate them altogether. The fact that the plaintiffs attached the confidential documents to court filings *after* the defendants had already disseminated them may be relevant to the question of damages but not to whether the defendants breached their obligations in the first place. The question of when the actuarial studies were produced and how they were used has little effect on whether the documents actually disclosed can be deemed confidential. Likewise, the defendants' assertion that the NDA requires only that the defendants apply "the same standard of care" ALU uses to "protect its own confidential and proprietary information" and that plaintiffs have not established the applicable standard of care is a red herring. That provision and the applicable standard of care would apparently only be relevant if the plaintiffs alleged some negligent disclosure of confidential information to third parties. Here, the plaintiffs allege—and the defendants admit—intentional disclosure of CSFG's documents to third parties, which is expressly and unambiguously prohibited by the NDA.

### 3. Damages

Next, the defendants assert that, even if a breach occurred, the plaintiffs cannot prove damages, because "no one relied on [CSFG's] confidential work product," and the PFLI packages

the defendants ultimately purchased were "dramatically different" from those proposed by the plaintiffs. (Doc. No. 129, at 29, 31.)

The court finds that neither of these assertions, even if proven true, would establish that the plaintiffs are *not* entitled to damages. Under Tennessee law, "[u]pon breach of a valid and binding contract, the law infers some damages, and generally the person guilty of the breach is liable at least for nominal damages, if actual damages cannot be proved." *Morristown Lincoln-Mercury, Inc. v. Roy N. Lotspeich Publ'g Co.*, 298 S.W.2d 788, 795 (Tenn. Ct. App. 1956) (citation omitted).[17] The NDA specifically prohibits the use of CSFG's confidential information for any purpose other than in the furtherance of the business relationship between CSFG and ALU, and Albright clearly used the information for his own purposes, even if his purpose was to illustrate to Pacific Life and NLG what he did not want to do. In addition, although NLG did not incorporate or use the information, its agents readily conceded that obtaining a competitor's information was helpful to them and provided a competitive advantage. While the record strongly suggests that the plaintiffs incurred minimal damages resulting from the alleged breach of the NDA, the quantification of such damages remains an open question.

The defendants are not entitled to summary judgment on the plaintiffs' claim for breach of the NDA.

## IV.    CONCLUSION

For the reasons set forth herein, the defendants' Motion for Summary Judgment (Doc. No. 128) will be granted in part and denied in part. The motion will be granted as to Count I of the SAC, for breach of the oral commission agreement, and granted as to Count III, for breach of

---

[17] The court is not persuaded by the defendants' argument, in their Reply, that the plaintiff must plead nominal damages in order to recover them.

fiduciary duty. In addition, because Andy Albright did not sign the NDA in his individual capacity, he is entitled to summary judgment on Count II, for breach of the NDA. The claim for breach of the NDA will remain pending against defendant ALU.

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge